## GRUBSTAKE INV. ASS'N et al. v. STATE et al. (No. 6878.)

(Court of Civil Appeals of Texas. Austin. Feb. 24, 1925. Rehearing Denied April 22, 1925.)

**Waters and water courses ☞89 — Mexican grant held to give title to bed of stream as against state.**

Grant of government of Coahuila and Texas in 1835, assigning river as a boundary, gave grantee title to its bed to thread of stream by virtue of the civil law in force in Mexico at time of grant, especially the 3 Partida, tit. 28, Law 31, as against claim that Mexican government was owner of bed of stream and state derived title therefrom; Act Dec. 14, 1837 (Rev. St. art. 5338), having no application to grants prior thereto.

Appeal from District Court, Travis County; George Calhoun, Judge.

Suit by the State of Texas and others against the Grubstake Investment Association and others. Judgment for plaintiffs, and defendants appeal. Reversed and remanded, with instructions.

Dougherty, Dougherty & Tarlton, of Beeville, and Gaines, Quin, Harley & Gaines, of San Antonio, for appellants.

W. A. Keeling, Atty. Gen., and W. W. Caves, Asst. Atty. Gen., for appellee State.

White, Wilcox, Graves & Taylor, of Austin, for appellees Coyle and Coyle Concord Oil Co.

McCLENDON, C. J. This case presents the question whether, under the Mexican law as it existed in 1835, a grant of land bordering upon a public stream vested in the grantee title in the bed to the thread of the stream, or, on the other hand, whether the boundary of such grant terminated at the borders of the stream. This question, we think, has never been judicially determined in this state.

Since we have reached the conclusion that the grant vested in the grantee title in the bed to the thread of the stream, and since this holding is decisive of the case, it will be necessary only to state so much of the record as has bearing upon this issue. The suit was brought by the state against various parties as the present owner of grants made in the year 1835 by the Mexican government, which grants called for the Frio river as one of their boundaries.

A. J. Coyle and others were impleaded as co-plaintiffs under the allegation that they were holders of oil leases issued by the land office, under chapter 83 of the Laws of 1917 (Vernon's Ann. Civ. St. Supp. 1918, arts. 5904–5904w), which authorizes the leasing of the bed of streams, where the title is in the state, for the purpose of prospecting and drilling for oil. While the suit in form was in trespass to try title, its real and only purpose was to determine the title to the oil and other minerals lying under the bed of the Frio river, adjacent to the surveys in question. No issue is involved as to the public character of the waters of the Frio river as distinguished from title to the bed of the stream, burdened with such servitude as the public character of the waters might impose.

The suit was tried to the court without a jury and resulted in a judgment in favor of the state and its coplaintiffs; from which judgment the defendants have appealed. While the statement of facts in the case is quite voluminous, there is little, if any, conflict in the evidence having material or substantial bearing upon the case. The pertinent findings of fact and conclusions of law filed by the trial court follow:

"Findings of Fact.

"(1) I find that the Frio river from a point above the area in controversy in this case to its confluence with the Nueces is an average of 100 feet or more in width between the tops of the first high banks from the center of said river; about 60 feet in width between the foot of said banks; and that the average width of the water, when not swollen by floods and not affected by drouth, is about 30 feet.

"(2) I find that the river flows about 75 per cent. of the time during the average year. During times of drouth, the river ceases to visibly flow; at such times it stands in holes or lakes, portions of the surface of the sand of the channel intervening between the holes being dry. During these periods water may be procured by digging a short depth in the sand.

"(3) I find that for some years a substantial amount of water has been diverted from the Frio river and from the Leona, one of its tributaries above the area in dispute, for irrigation purposes.

"(4) I find that the defendants hold title to the lands bordering on the river, under grants made by the government of Coahuila and Texas, in 1835; that at the time these grants were made, the Frio was designated and regarded by the Mexican government as a river, and that it was not intended to include the bed

or channel of the river within the boundaries of said surveys, and same was not included therein.

"(5) I find that the coplaintiff, A. J. Coyle, holds a permit from the commissioner of the general land office of the state of Texas authorizing him to prospect and drill for oil and gas in that portion of the channel or bed of the Frio river described in plaintiff's petition, and that the coplaintiff, Coyle-Concord Oil Company, has furnished money for the development of the property covered by said permit."

### "Conclusions of Law.

"(1) I conclude that the law in force in Mexico, at the time of the issuance of the grants bordering the portion of the Frio river involved in this suit, is controlling in determining the question of whether the bed of the river was included in such grants.

"(2) I conclude that in 1835, when the lands bordering the portion of the Frio river in controversy were granted, the Frio was, under the laws in force in Mexico at that time, a river; and that its channel or bed was not included in such grants, but that the complete title thereto was reserved in the Mexican government; that the title to such channel or bed, so reserved to the Mexican government, passed to the Republic of Texas, and the state of Texas, and is now vested in the plaintiff, the state of Texas. I therefore hold that the plaintiff is entitled to recover judgment for the title to and possession of all that portion of the bed or channel of the Frio river described in its petition."

Findings and conclusions having no bearing upon the controlling issue are omitted. The fourth finding of fact of the trial court is unquestionably based upon the legal conclusion that, under the civil law in force in Mexico in 1835, the bed of a public river (whether navigable or nonnavigable in fact) was public in the same sense that the waters of such river were public, and that a grant by the government calling for a stream as a boundary vested in the grantee title only to the low-water edge and not to the thread of the stream, in like manner as grants under the republic or state of Texas, after the passage of the act of December 14, 1837 (present article 5338, Revised Statutes), calling for the borders of a stream navigable under the provisions of that act. Each of the grants in question calls to begin on the margin of the Rio Frio and to follow the river upward by specific numbers of measurements, "along the different courses formed by its currents." The field notes of the meanders of the river are not given in the grants, but this fact we think has no significance. The stream is clearly called for as one of the boundaries of the surveys, and unless the holding of the trial court with reference to the civil law in force in Mexico at the time of these grants is correct, then clearly the grants carry title to the bed of the river to the thread of the stream. Muller v. Landa, 31 Tex. 265, 98

Am. Dec. 529; Dutton v. Vierling (Tex. Civ. App.) 152 S. W. 450. The trial court makes no finding whether the Frio river at the point in question was in fact navigable. The court no doubt took the view that this question was immaterial, and that no distinction existed in the civil law of Mexico with reference to public rivers regardless of whether they were navigable or nonnavigable in fact. We think this conclusion is correct. Nor does it appear to be seriously contested by the parties to the suit on either side.

It is conceded that the various laws of "Las Siete Partidas," which have any bearing upon this question, were in force in Mexico in 1835. The following laws from title 28 of the third Partida we think control the question:

"Law 3. *What are the Things Which Belong in Common to All Creatures Living.*—The things which belong in common to all the living creatures of this world are, the air, rain, water, the sea and its shores, for every living creature may use them, according to their wants. And therefore every man may enjoy the use of the sea and its shores, either for the purpose of fishing, or navigation, or doing there whatever else he may conceive advantageous to him. Nevertheless, if there be a house on the sea shore, belonging to any one, it ought not to be pulled down, or used, in any manner, without the consent of the builder or owner. If, however, it be destroyed by the sea, or otherwise, or fall to ruin, then any person may build another in its place.

"Law 4. *What are the Things a Man may Do, upon the Sea Shore.*—Every man who chooses may build a house or cabin upon the sea shore, as a retreat, and he may erect there, any other edifice whatever, to serve his purposes: Provided he does not thereby interfere with the use of the shore, which every one has a right in common to enjoy. He may also build gallies there, or any other vessel whatever, or stretch and mend his nets, and when he is there, or employed for these or other purposes of a similar nature, no one has a right to disturb him. And by the sea shore is understood all that space of ground covered by the waters of the sea, in their highest annual swells, whether in winter or summer."

"Law 6. *That Every One may Make Use of Ports, Rivers, and Public Roads.*—Rivers, ports, and public roads belong to all men in common, so that strangers coming from foreign countries may make use of them in the same manner, as the inhabitants of the place where they are, and though the dominion or property (senorio) of the banks of rivers belongs to the owner of the adjoining estate, nevertheless, every man may make use of them, to fasten his vessel to the trees that grow there, or to refit his vessel, or to put his sails or merchandise there. So fishermen may put and expose their fish for sale there, and dry their nets, or make use of the banks for all other like purposes, which appertain to the art or trade, by which they live."

"Law 7. *That Trees Growing on the Banks of Rivers Belong to the Owners of the Adjacent Estate in Front of Them.*—All the trees growing on the banks of rivers belong to the

owners of the adjoining estate, who may cut, or cause them to be cut down, or do with them whatever they think fit; yet, if at the time they are about to cut them down, they find any vessel fastened, or about to be fastened to such trees, they can not immediately cut them down, otherwise they would interfere with the right which every man has to use the banks of rivers, as is above said, but if there is no vessel fastened, nor about to be fastened to such trees by any one, then they may be cut down and converted to the owner's use.

"Law 8. *That No One has a Right to Build a Mill or Other Edifice on a River, by Which the Navigation of Vessels may be Obstructed.*—No man has a right to dig a new canal, construct a new mill, house, tower, cabin, or any other building whatever, in rivers which are navigated by vessels nor upon their banks, by which the common use of them, may be obstructed. And, if he does, whether the canal or edifice be newly or anciently made, if it interfere with such common use. it ought to be destroyed; for it is not just that the common good of all men generally should be sacrificed to the interest of some person only."

"Law 26. *To Whom Belongs the Increase Which a River Makes to an Estate.*—Rivers sometimes swell to such a height, that they carry away a portion of one estate, and join it to another, situated elsewhere, on their banks. Wherefore we say, that the earth which a river carries away from an estate, little by little, and imperceptibly, because not all in a body, becomes the property of him to whose estate it is carried, and he who lost it, has no claim whatever to it. But if the river carries away a part of an estate all at once in a body, whether with or without its trees, the earth so carried away, will not become the property of him to whose estate it is joined, unless a sufficient time had elapsed for the trees to take root there, for then this new portion of earth becomes the property of the owner of the lands where the trees thus take root; but in that case he will be obliged to pay the former proprietor the damage he had sustained, according to the estimation of good men, skilled in cultivating lands.

"Law 27. *How Islands Formed by Rivers are to be Divided.*—Islands sometimes rise in rivers, and men dispute about the right of property in them. We therefore say that, if the island rise in the middle of the river, the owners of the estates, on the opposite banks, ought to divide it in the middle, each one taking as much of that half towards his estate, as equals the extent of his lands upon the bank. But if it it rise entirely in one-half of the river, towards one side, it ought to be divided as is above said, by the owners of the adjacent lands on that side. But if it does not rise entirely in one-half of the river and towards one of its shores, nor in the middle, but so that the greatest part of it be rather on one side than the other, then a cord must be taken and measured out, as long as the river is wide, and after having measured it, of the same length with the width of the river, so that it be neither more nor less, it must be doubled, and the place marked on the island to which the half of the cord extends, from that point a division must be made, between the proprietors of the adjacent banks, agreeably to what is above said,

each taking a portion of the island, according to the extent of his estate opposite thereto.

"Law 28. *If a River Form an Island Within the Estate of Any One, He Does Not Lose His Property In It.*—Rivers are sometimes so swelled by the increase of waters that they enter upon people's estates, traverse them, and form islands there. And, notwithstanding we prescribed, in the preceding law, the manner in which islands formed in rivers are to be divided; yet it is not to be understood that those formed, in the way here spoken of, are to be so divided; for with respect to these, no one can have any right to them, except the owner of the estate within which they are formed; he preserving the dominion or property which he before had in his estate, unimpaired by such event.

"Law 29. *To Whom the Islands Belong, That are Newly Formed in the Sea.*—It seldom happens that islands are newly formed in the sea. Yet if one should be so formed, we say it will belong to the first occupant; and he or they who first occupy it will owe. obedience to the sovereign, within whose dominion it is formed.

"Law 30. *To Whom the Island Belongs, That is Formed in Front of an Estate Which is Held by a Tenant or Usufructuary.*—A man may have the usufruct for life, of an estate situated on the bank of a river; or he may hold it by feudal tenure. And though we have said, in the fourth preceding law, that islands, which are formed in rivers, ought to be divided between the owners of the lands, on the opposite banks, in the manner we have therein prescribed; yet they who have the usufruct of such lands, or hold them by feudal tenure, can have no claim whatever to these islands; but they will respectively belong, as well as the usufruct of them, to the owners of the adjoining estates. Yet if an estate of which one has the usufruct, or which he holds by feudal tenure, is increased by the alluvion of the river, the usufruct of what is thus added, will belong to him, in the same manner as the usufruct of the estate itself, to which it was added.

"Law 31. *When a River Changes its course, to Whom will Belong the Bed Where it Formerly Run.*—Rivers sometimes take new courses, abandoning their former beds and leaving them dry. And as disputes may arise about the right of property to the ground thus left, we say it will belong to the owners of the adjoining lands, in proportion to the extent of their estates upon the banks, and the owners of the lands, through which the river makes its new bed, will lose the property in the soil it covers, which will now be of the same nature of the former bed, and will like the river itself vest in the public.

"Law 32. *That One Does Not Lose the Property in His Estate, Though Covered with Water.*—Lands are sometimes covered with water, by the inundation of rivers, and remain so covered for many days, and though the owner, during that time, loses the possession of them, he nevertheless preserves his right to the property; for as soon as the waters retire to their former channel and leave the lands uncovered, he will enjoy them as before."

It can hardly be questioned that under law 31, above quoted, the title to the bed of a

river is vested in the riparian owners upon a change in the course of the river which leaves the old bed dry. And while this express declaration of law 31 is not seriously questioned by appellants, they contend that so long as the river covers the old bed the title is in the sovereignty, subject to be defeated by condition subsequent, namely the changing of the course of the stream and consequent abandonment of the original bed. The reasoning upon which this conclusion is based may be briefly stated as follows: (1) Under law 6 defining what things are public, rivers and public roads are mentioned without distinction or qualification, and since, under the civil law, the title to the soil to public roads was in the public or sovereignty (Mitchell v. Bass, 26 Tex. 372; Id., 33 Tex. 260) it follows that title in fee to the bed of a public stream must likewise be in the public or sovereignty, so long as the river maintains its public character; and (2) that law 31 in effect decrees that the soil of a public river is public so long as the river maintains its character as such.

The case of Mitchell v. Bass came before the Supreme Court for the first time in 1862, and the opinion was delivered by Chief Justice Wheeler. Involved in the case was the question whether under the civil law grants bordering on a public highway passed the fee to its center, subject to the public use as a highway, so that upon abandonment of the highway there was no vacancy created between opposite abutting grants. This question seems not to have been raised by the parties, but was suggested by the court. After stating the common law upon the subject, to the effect that the fee to the highway passed by the grants, the court say:

"It is said that the rule of the civil law is different, and that by that law the soil of public highways is in the public. 3 Kent, Com. (9th Ed.) 558, note. And so it was decided by the Supreme Court of Louisiana in the case of Renthorp v. Bourg, 4 Martin's Rep. 97, where the question was discussed with much learning and research. If such was the rule of law in the country at the time the labors in question were granted, the decision of the case would seem to depend upon the question which the parties have contested as to the existence of a space or vacancy between the labors. But as the question is one of importance sufficient, it is thought, to require a careful examination into the law, before it is taken for granted, it is thought proper to call attention to it, in order that counsel may give it such consideration as they may think proper."

The later appeal of the case brought it before the Supreme Court in 1870 (33 Tex. 260), a court whose decisions the Supreme Court, as subsequently constituted, have frequently declined to follow. The holding was there made that the fee to the highway never passed by the grants, and when the highway was abandoned the soil, which it traversed,

was public vacant land. Authorities cited are articles 179 and 180, Schmidt's Laws of Spain and Mexico, Renthorp v. Bourg, 4 Mart. (O. S.) 97, and four other Louisiana cases.

The note in Kent cited in Mitchell v. Bass, 26 Tex. 372, cites only the Renthorp Case. Thirty-two years after the decision in that case the question again arose and the Supreme Court of Louisiana, in a learned opinion, declined to follow, "at least to its whole apparent extent," the holding in that case. We quote from the later opinion:

"It is contended, on behalf of the plaintiffs, that, having established the road to have been a public road, the soil is in the public, on the authority of the case of Renthorp et al. v. Bourg et ux., 4 Martin's Reports, 97. This case was determined in 1816, and it was there held that the part of the Roman law, which declares the soil of a highway to be public property, appeared to be in force in France, and was so in Louisiana when the country passed under the dominion of Spain.

"In dissenting from the principle laid down in this decision to its whole apparent extent, we deem it proper to give some reasons for our reservation. A recognition of the doctrine without qualification, at this time, would be considered as an alarming disturbance of private right.

"As civilization and improvements have advanced in this state, as the navigation of our water courses has improved, and our lands been explored and reclaimed, new settlements have been established, and new means of passage been required. New roads have consequently been made by public authority, and old ones abandoned. The changes in the banks of the Mississippi necessarily produce the same result, and the old roads about villages have been in many instances inclosed and used as private property. The importance of the subject, with these facts before us, is therefore obvious.

"The court held that, under the Roman law, the soil of the viae publicae was public property. But the difficulty with us is, in the application of the laws in relation to those great works—the roads of the Roman Empire—some of which exist to this day, to those of an infant colony like that of Louisiana, without population, and a portion of whose soil only was beyond the reach of annual inundation. Those of Rome were intended to be as permanent as the labor of man could make them, while those in Louisiana would necessarily be such as the changes in the rivers and the future settlements would require.

"The authorities on which the soil in a highway was held to be public are Partida 3; 28, 6; the Code of 1808, p. 94, art. 6; and Mayor v. Metzinger, 3 Martin, 303.

"The text of the Partidas authorizes no such conclusion, as to the property in the soil. The commentary of Gregorio Lopez gives no such interpretation to it.

"The Code mentions highways, as among public things, 'the property of which belongs to a whole nation, and the use of which is allowed to all the members of the nation.' In the French text the corresponding words are, les grands chemins; and, in the case of the Mayor v. Metzinger, 3 Martin, 303, nothing more is

decided than that, roads and streets cannot be appropriated to private use, and that a grant of either would be void.

"That there are grands chemins, highways, of which the soil is public property, in the same manner as that of the viæ publicæ in Rome, there is no necessity for our determining; but we desire it to be understood that we cannot assent to extending the principle to all highways or public roads throughout the country, and that the doctrine in Renthorp's Case, is not to be understood as recognized without this limitation."

Hatch v. Arnault, 3 La. Ann. 485.

The reasoning in this quotation is quite cogent, and it is by no means certain that had the question been fully investigated and decided when it was before our Supreme Court for the first time in Mitchell v. Bass, the court would have reached the same conclusion as to public roads in Texas, as that upon the later appeal of that case. We especially direct attention to the comment of the learned Chief Justice of Louisiana upon 3 Partida, 28, 6:

"The text of the Partidas authorizes no such conclusion, as to the property in the soil. The commentary of Gregorio López gives no such interpretation to it."

But whether under the Roman or civil law the title to the soil of all public highways was in the public, and so remained even after the highway was abandoned, it by no means follows that the same rule applied to the bed of a public stream. There are many characteristics inherent in the Roman roads and the royal roads of France and Spain that had no necessary counterpart in public streams. Especially to be noted was the permanent character of such roads, particularly the Roman, as contrasted with the shifting characteristic of rivers in certain localities. We may therefore pass this subject as having no controlling influence upon the question before us.

Considering now appellee's second contention that the latter portion of law 31 above quoted vests the fee to the bed of public streams in the public, we have reached the conclusion that the language employed, especially when considered with other laws of the Partidas, should not be given such construction. We think the import which this language was intended to carry is merely that when a public river changes its old bed for a new one, the latter upon private property, the river maintains its public character in its new bed, and the owner of the soil thereby loses his ownership of or dominion over the soil thus covered, in like manner as though the river had originally held that course. Any other interpretation of this language would, we believe, be inconsistent with the first sentence of law 31, and more especially with law 30. If the owners' title extended only to the borders of the stream, then there would be no basis for holding that

islands formed in the middle of the stream become the property of the riparian owners. There is no analogy between this holding and the law of accretion. Quoting from Municipality No. 2 v. Orleans Cotton Press, 18 La. 172, 36 Am. Dec. 624:

"By the law of alluvion, a law founded on justice, reason and sound policy, and which prevails throughout the different countries of Christendom with a singular uniformity; land is considered not in relation to the ownership of it, but its position. The alluvion accrues to the soil, whether its owner be the sovereign or a corporation, subject or citizen; and a corporation owning the soil must necessarily acquire by alluvion, in the same manner as any other owner would."

But the title to islands formed in public streams must rest upon an entirely different basis. They in no sense accrue to the soil of the riparian owner, and if title to them is to vest in such owner, then it seems to us it must be so only because it is already vested in him, subject to a public use, which has ceased to exist. It would be a strange doctrine, it seems to us, to hold that the title to the bed of a public stream is vested, divested, revested, and so on, with successive changes in the course of the stream, or as islands emerge or disappear from the surface of its waters. We have found no adjudicated case which advances this doctrine. In fact, all the adjudicated cases we have been able to find upon the subject, whether under the civil or common law, hold that where the title to the bed of the stream is in the public, a change in the course of the stream by avulsion does not extend the title to the riparian owner beyond his boundaries as they existed before the change in course.

It will be observed that by the Partidas roads were made public without qualification and without provision for their abandonment, whereas definite pronouncement was made with reference to islands formed in rivers, their abandoned beds and their banks. Thus was evidenced a clearly different conception regarding the permanent location of a public highway, as distinguished from a river bed, which might change its location from time to time under the operation of natural laws. A clear distinction is also drawn in the Partidas between the shores of the sea and their counterpart, the banks of public rivers. The former were public, absolutely, and the latter only to the extent necessarily incident to the public use of the river. Thus it will be seen that the rights of the riparian owner were only limited by the public use of the river, which necessarily deprived him of any dominion over the soil constituting its bed so long as it was covered by waters which were public. The express provisions of the Partidas negative the conception that the soil occupied by the bed of a public river constituted public domain.

The Roman law upon the subject of water had been highly developed before the

compilation of the Institutes of Justinian, and it is conceded by many authorities upon the subject that it made its impress upon the laws of all the countries of Europe, and even had its effect upon the common law of England.

"The Roman Law made no definite declaration as to the title to the soil of rivers.

"By that law the air, running water, the sea, and the shores of the sea, were common to all men by the law of nature. Justinian Institutes, liber 2, tit. 1, § 1.

"So, if a river entirely forsakes its natural channel, and begins to flow elsewhere, the first channel appertains to those who possess the lands close to the banks of it in proportion to the extent of each man's estate next to such bank, and the new channel partakes of the nature of the river, and becomes public. And if after some time the river returns to its former channel, the new channel again becomes the property of those who possess the lands contiguous to its banks. Just. Inst. § 23.

"If an island rises in a river, and is placed exactly in the middle of it, such island shall be common to them who possess the land near the banks on each side of the river in proportion to the extent of each man's estate adjoining the banks. But if the island is nearer to one side than to the other it belongs to them only who possess lands next to the banks on that side to which the island is nearest. Just. Inst. § 22.

"Vinnius, a Dutch writer, commenting on this, says that with regard to the alveus of the river the ditio and potestas were in the public, while the proprietas was in the owner of the adjoining field. Sections 2, 4.

"In speaking of the right of the adjoining proprietor, Vinnius states that the alveus of the river beyond the public use was reckoned by the ancients as part of the adjoining estates, as if formerly taken from them. So, speaking of the banks, which, although they are acknowledged to be private and part of the adjoining estates, the public have a right to use, because the public cannot use the river properly without the bank, he says the use of the alveus, although the soil of it is recognized as private, is also public, because without the alveus the people are not able to use the river. So, as the use of the bank, the alveus becoming dry, returns to its proprietor, because now the public can no longer use it, likewise the alveus which the river has left reverts to the proprietor because the public can no longer use it.

"In other words, the public has an easement and the riparian owner the title. This would seem to be a much more reasonable explanation of the doctrine than by referring the change of title to a shifting proprietorship for which the law makes no provision.

"As holding the doctrine which was subsequently adopted by Vinnius, Selden cites (Mare Clausum, bk. 1, c. 21) Bartolus, Joannes Buteo, Baptista, Aymus, Antonius Maria, Joannes Gryphiander, while Cæpola held that individuals might acquire a right in rivers by prescription, and Rothensal catalogued them as originally the Emperor's patrimony and among the rights or royalties belonging to his exchequer. Selden adds that nothing is more common than the asserting of the private dominion of rivers as well as their banks, in the laws of all nations whose customs are known to us. Nor is there any difference in nature between a greater or a lesser, a private or a public, river.

"In Lorman v. Benson, 8 Mich. 18, 77 Am. Dec. 435, Campbell, J., said that Vinnius demonstrates that by the Roman law the title to river beds belongs to riparian owners, subject to the public easement of passage and of moorage on the banks—citing Vinnius, Just. lib. 2, tit. 1, §§ 4, 5, 20, 22, 23.

"In France, however, the law will not admit of such interpretation, for these sections were carried into the Code Napoléon in such a way as to completely change the meaning which could be given to them. In title 2, § 560, it is stated that islands formed in the bed of streams which are navigable or which admit floats belong to the nation, if there is no title or prescription to the contrary.

"Section 561 states that islands formed in rivers and streams not navigable, and not admitting floats, belong to the proprietor of the shore on that side where the island is formed; if the island is not formed on one side only it belongs to the proprietors on the shore on the two sides divided by an imaginary line drawn through the middle of the river.

"If a river or navigable stream capable of admitting floats or not, form a new course, abandoning its ancient bed, the proprietors of the land newly occupied take, by title of indemnity, the ancient bed abandoned, each in proportion to the land of which he has been deprived. Section 563.

"And such seems to have been the rule there for a very long period, for Selden, writing in 1635, says (Mare Clausum, bk. 2, c. 18) that it is a received custom in that country that the King is the owner of all rivers that are navigable where they belong not to some subject by a particular prescription of possession or some other title besides the possession of the adjacent land—citing Cod. Hen. III, lib. 16.

"Under the civil, i. e. French, law a grant of land bordering on a river passes as accessory thereto the right to the banks of the river only. Morgan v. Livingston, 6 Mart. (La.) 119." Law note, 42 L. R. A. 165.

This quotation is borne out by all the text-writers we have been able to find upon this subject. The statement with reference to the French law is carried into the Civil Code of Louisiana, arts. 504, 505, 506, 507, 510. It will thus be seen that the civil law underwent a substantial change in France, notably in two respects: (1) That as to islands formed in the bed of navigable streams title vested in the sovereignty and not in the riparian owners; and (2) that when a stream, whether navigable or not, changed its course the soil of the old bed vested—not in the sovereignty or riparian owners—but, by way of indemnity in the former owners of the new bed. These express provisions of the French and Louisiana codes are at variance both with the Roman law as contained in the Institutes and the Spanish law as embodied in the Partidas. The decisions of Louisiana can therefore have no bearing upon the question before us.

Returning to the Roman law, we quote the

following from Farnham on Waters (volume 1, p. 240):

"The Roman law declared that the air, running water, the sea and the shores of the sea were common to all men by the law of nature. This statement has been generally interpreted by the courts in America to mean that the title of the soil to running streams was in the public. But this interpretation does not seem to be justified by the facts, for it is further declared that if a river, entirely forsaking its natural channel, begins to flow in another direction, the old bed of the river belongs to those who possess the lands adjoining its banks in proportion to the extent that their respective estates adjoin the banks. The new bed follows the condition of the river—that is, becomes public. And if, after some time, the river returns to its former channel, the new bed again becomes the property of those who possess the lands contiguous to its banks. If the title to the bed was in the public when covered with water, how did it became vested in the riparian owner as soon as the water left it? Vinnius, a Dutch writer, answers this question by stating that the title was always in the adjoining proprietor and that the use merely was in the public. He asserts that the title to the newly born island is in the riparian proprietor because it is part of the alveus, and that the alveus belongs to such proprietor. He says, just as the alveus, if denuded, will be reckoned as part of the adjoining estate, so that the part that is denuded by the appearance of an island should likewise be a part of it. He further says it is known that the alveus is not fully public, but so long as it is covered by the river the people have the use of it; but as soon as it is uncovered by the water it is the private property of the adjoining owner. And he likens the river to a public way which is considered as part of the adjoining estate, so that the alveus, even while it is occupied by the river, should to a certain extent be considered as part of the adjoining estate. And he says that by old custom this is the rule. He further illustrates his contention by comparing the alveus with the bank, for he says the bank is admittedly private property subject to public use, and states that the principle applies to the alveus, which, being private is subject to public use. As holding the doctrine that the title to the alveus was in the riparian owner, Selden cites Bartolus, Joannes, Buteo, Baptista, Aymus, Antonius Maria, and Joannes Gryphiander, while Cœpola held that individuals might acquire a right in rivers by prescription, and .Rothensal catalogued them as originally the emperor's patrimony and among the rights and royalties belonging to his exchequer. Selden adds that nothing is more common than the assertion of private dominion over rivers, as well as their banks, in the laws of all nations whose customs are known to us. Nor is there any difference in nature between a greater or a lesser, a private or a public river. The Code Napoléon, however, established the law of France to the contrary. It said that 'islands formed in the bed of streams which are navigable or which admit floats belong to the nation, if there is no title or prescription to the 'contrary. * * * Islands formed in rivers and streams not navigable, and not admitting floats, belong to the proprietor of the shore on that side where the island is formed; if the island is not formed on one side only, it belongs to the proprietors on the shore on the two sides, divided by an imaginary line drawn through the middle of the river. * * * If a river or navigable stream, capable of admitting floats or not, forms a new course, abandoning its ancient bed, the proprietors of the land newly occupied take by title of indemnity, the ancient bed abandoned, each in proportion to the land of which he has been deprived.' When that Code was submitted to the tribunals of the republic for comment the one at Rouen, in commenting upon the section which relates to alluvion, states that the 'edicts and declarations of the former kings which claimed for the domain the islands of navigable rivers and fleuves (primary rivers) were only exchequer laws; these laws were founded on the false pretext that the islands were an appendage of the river, which they considered as belonging to the King. But the river itself is not a national domain, but a thing of which the public have the use; it belongs to the nation, not in full property but as an appendage of its sovereignty.' Vattel says, if ownership of land on the banks of a river has a natural boundary with right of alluvion, the bed of the river belongs to the owner of the bank in case it abandons its course. But if the adjacent lands have not natural boundaries the title to the bed continues in the state. Under the French law the title of the 'riparian owner goes only to the low-water mark. But as shown by the writers quoted above, the general understanding of the Justinian law was that the title of the stream was in the riparian owner and that the public interest was simply the right to use."

The only authority for the statement in the above quotation to the effect that the Roman civil law "has been generally interpreted by the courts in America to mean that the title to the soil of running streams was in the public," is an early case in New York where the question arose in reference to a grant made while the settlement was under Dutch rule. The author, reviews the New York decisions upon the subject, and concludes:

"It thus appears that the fact that under the civil law the title was in the public was assumed and was never 'fully examined, and that therefore the New York cases are of very little weight upon the question, What is the true civil law rule? Although they have had great influence in establishing the idea that under it the riparian owner had no title to the bed of the stream.".

The Roman civil law upon this subject is fully treated in 1 Kinney on Irrigation and Water 'Rights (2d Ed.) p. 959 et seq. In commenting upon the New York decisions above referred to this author states in a note (page 981):

"But it seems that even the Dutch had trouble in deciding this question. Vinnius, one of the leading Dutch authorities, asserts that by the Roman law the title to the bed of navigable rivers was in the riparian owners, subject to the easement of the public of passage and of mooring on the banks."

Under the common law:

"The modern rule in England as to the ownership of fresh water navigable rivers is that the riparian owners own the bed of the streams, subject to the rights of the public to use the streams for navigation." 1 Kinney, p. 388.

The courts of the different states, in this country that had adopted generally the common law of England have divided upon this subject; some following the English common law, and others declining to follow it on the ground that conditions in this country are so essentially different from those in England with reference to navigable streams above tide water, that the English rule should not apply. Among the latter states is Missouri. The question arose in Texas for the first time in City of Victoria v. Schott, 9 Tex. Cr. App. 332, 29 S. W. 681, in which the decisions in Missouri were followed. The same conclusion was again reached in City of Austin v. Hall, 93 Tex. 591, 57 S. W. 563. No authorities are cited in the latter case, and from the discussion of the question in the opinion it is manifest that the conclusion reached was based upon the act of 1837 (R. S. art. 5338). The opinion concludes:

"But, in addition thereto, by declaring such streams to be navigable, the state reserved the title to the beds thereof, which are subject to the control of the state."

The act of 1837 could have no effect on grants made in 1835. In Kinkead v. Turgeon, 74 Neb. 573, 104 N. W. 1061, 109 N. W. 744, 1 L. R. A. (N. S.) 762, 7 L. R. A. (N. S.) 316, 121 Am. St. Rep. 740, 13 Ann. Cas. 43, the question squarely presented was whether a riparian owner took title to the thread of the stream. The common law of England was in force by statute in the territory and state of Nebraska, when applicable and not inconsistent with the Constitution of the United States, or with the organic or statutory law of the state. The case was first decided by the Supreme Court Commissioners who adopted the holding of those states which decline to follow the English common-law rule. The Supreme Court, however, granted a rehearing, and in an opinion evidencing much study and research reversed this holding. The rule of the English common law is thus stated:

"Under the common law of England the title to the bed of the sea below high-water mark, and to the bed of all rivers as far as the flow of the tide extended, was in the crown, but the title to the bed of all fresh-water rivers above the ebb and flow of the tide, whether navigable or nonnavigable, where the river formed the boundary between adjoining proprietors, was in the riparian owner to the thread of the stream."

After quoting from Kent's Commentaries (13th Ed.) 427, the opinion reads:

"This also is the rule of the civil law. Ware, Roman Water Law, §§ 22, 94."

The court then proceeds:

"There appears, then, to be no controversy as to what constitutes the common law of England in regard to fresh waters or navigable rivers above the flow of the tide. Some of the cases in this country fail to draw a distinction between the rule of the common law with reference to rivers which are navigable in fact above the flow of the tide, and those navigable only where the tide flows, and adopted the idea that by the common law no rivers were navigable or considered as navigable in law except those in which the tide rose and fell. Comparing, then, the diminutive size and length and volume of the rivers of England with the magnificent waterways of this country, it was held that the common law as to navigable rivers was inapplicable to the situation in this country, and that our great rivers, which are navigable in fact for hundreds or perhaps thousands of miles, are to be treated in law as were navigable rivers of England, meaning thereby the rivers in which the flow of the tide was perceptible. Much reasoning has been indulged in, based upon the apparent disproportion of the rivers of England and America, to show the necessity of abrogating the common-law rule on account of the actual navigability of our rivers above tide water. However, the rule of the common law has been adopted in Connecticut, Delaware, Georgia, Illinois, Kentucky, Maine, Maryland, Massachusetts, Michigan, New Hampshire, New Jersey, partly in New York, and in Ohio, South Carolina, and Wisconsin. It is rejected in Pennsylvania, Virginia, North Carolina, Alabama, Florida, Texas, Tennessee, Iowa, Kansas, Minnesota, Missouri, Oregon, Nevada, and California. In some of the states which reject the rule the rejection is based upon the system of land surveys of the United States, it being held that, where in the original survey the boundary next the stream is meandered, the government has parted with its title only to the extent of the meander line, and has reserved to itself, or to the state which afterwards was created, the title to the bed of the stream. Later decisions of the United States Supreme Court, however, have settled that the meander line along the bank of a navigable river is not a monument of title or boundary line, but merely marks the place where the water flowed at the time of the survey. Hardin v. Jordan, 140 U. S. 371, 11 S. Ct. 808, 838, 35 L. Ed. 428; Jefferis v. East Omaha Land Co., 134 U. S. 178, 10 S. Ct. 518, 33 L. Ed. 872. And the doctrine of that court now is that, by the admission of the several states, whatever right or title the United States had to the bed of such navigable streams passed to the state government, and that the local law of each state determines the question whether the bed of such streams belongs to the state or to the riparian owner. Barney v. Keokuk, 94 U. S. 324, 24 L. Ed. 224; St. Louis v. Myers, 113 U. S. 566, 5 S. Ct. 640, 28 L. Ed. 1131; Hardin v. Jordan, supra; St. Anthony Falls Water-Power Co. v. St. Paul Water Com'rs, 168 U. S. 349, 18 S. Ct. 157, 42 L. Ed. 482. These decisions of the Supreme Court of the United States conclusively establish the fact, therefore, that the common law with reference to riparian ownership in navigable streams is not inconsistent with the Constitution of the United States nor with the organic law of this state, and, since no law upon this subject has been passed by the Leg-

islature of the territory of Nebraska or of the state of Nebraska, the common law is not inconsistent with the statutory law of the state."

The court then takes up the question whether the common-law rule is applicable to conditions in Kansas, and concludes that it is:

"The fact that the rights of riparian owners are preserved ad filum aquæ is not inconsistent with, and does not interfere with, the right of navigation. The public retains its easement of the right of passage along and over the waters of the river as a public highway. This is the interest of the public in connection with such rivers which is paramount, and which is and should be protected by the courts. If, however, the river ceases to be navigable at any particular point, whether by the gradual filling up of its old bed, or a part of it, by the process of accretion, or by a sudden change of its bed by the carving out of a new channel, the public right attaches to the waters of the new channel to the same extent as it did while it flowed in the former bed. The public, then, has lost nothing by the change of channel. All its rights have been retained. As was said long ago by Ulpian: 'In like manner if a river leaves its bed and begins to flow elsewhere, whatever is done in the old bed is not subject to the interdict, because not done in a public river, as the bed belongs to the neighbors on each side, or else the bed belongs to the occupant if he has fields marked off thereon. Certainly the bed ceases to be public. Also the new channel which the river has made, although it was private, begins, nevertheless, to be public, because it is impossible that the channel of a public river should not be public.' Ware, Roman Water Law, § 22. To hold otherwise in case of a stream of the characteristics of the Missouri might well lead, by way of repeated changes of the river's channel, to additions to the public domain at the expense of adjoining proprietors."

For a full discussion of the common-law rule and its adoption or rejection by the several American states see 1 Kinney on Irr. and Water Rights (2d Ed.) §§ 328–332, inclusive; Gould on Waters (3d Ed.) §§ 41–76, inclusive; 1 Farnham on Waters and Water Rights, §§ 48, 51, 53.

From the study and investigation which we have been able to give to this subject, in which we have been greatly aided by able briefs of counsel representing both sides of the case, we have reached the following conclusions:

(1) While the Roman law made no express declaration upon the title to the bed of rivers so long as they are covered by water, yet title in the riparian owners to the thread of the stream necessarily follows from the fact that title to islands, formed in the stream, and to the bed when the river changes its course is vested in the riparian owners; and this conclusion is reached, with practical unanimity, by the eminent scholars and jurists, who have investigated and written upon the subject.

(2) The rule of the common law of England, which vested such title in riparian owners, if not, in fact, derived from, was no doubt influenced by, the Roman law upon the same subject.

(3) The Partidas, while differing from the Roman law in many respects, in no particular differs therefrom in respect to this subject.

There remains only to consider the Texas decisions, which counsel for appellees cite as reaching a contrary conclusion. We have already adverted to the cases of Victoria v. Schott and Austin v. Hall, which manifestly are not based upon the civil law.

In Galveston v. Menard, 23 Tex. 349; Hynes v. Packard, 92 Tex. 44, 45 S. W. 562; and Rosborough v. Picton, 12 Tex. Civ. App. 113, 34 S. W. 791, 43 S. W. 1033, were involved tidewater lands as to which the civil and common law were substantially the same.

The opinion in Landry v. Robinson, 110 Tex. 295, 219 S. W. 819, is based upon the finding that "the San Jacinto river is a navigable stream within the meaning of Rev. Stats. art. 5338, retaining an average width of more than 30 feet," and the holding, based upon that article, in Austin v. Hall. The doctrine of the Mexican civil law was not involved in that case, so far as the opinion discloses.

With reference to Siddall v. Hudson (Tex. Civ. App.) 206 S. W. 381, we quote with approval from appellees' brief:

"While this case, measured by its results, may be considered as favorable to us, yet the holding does not seem to have been based upon a construction of the Mexican law, and we do not look upon it as of very great value."

It might be added that the holding was in direct conflict with the express language of the Partidas, since the court was dealing with the old bed of an abandoned stream, and not with title to the bed while covered with its waters.

As stated at the outset of this opinion, the question here presented has not been adjudicated in this state, so far as our search and that of able counsel has revealed.

The trial court's judgment, in so far as it is against appellants, is reversed, and the cause is remanded to the district court with instructions to render judgment in accordance with our holding herein, in so far as it affects the rights of appellants.

Reversed and remanded, with instructions.