**STATE et al. v. R. E. JANES GRAVEL CO., Inc., et al.**

**No. 9340.**

Court of Civil Appeals of Texas. Austin.

July 14, 1943.

Rehearings Denied in part and Granted in part Nov. 10, 1943.

Gerald C. Mann, Atty. Gen., and Ocie Speer, and Fagan Dickson, Asst. Attys. Gen., for appellant State.

J. M. Patterson, Asst. City Atty., and Gibson R. Randle, Acting City Atty., both of Austin, for appellant City of Austin.

Dan Moody and White, Taylor, & Chandler, all of Austin (Ike D. White, of Austin, of counsel), for appellees.

McCLENDON, Chief Justice.

This suit (with which another suit was consolidated) was brought by the State against a number of defendants to enjoin them from taking gravel from the bed and south or right bank of the Colorado river between the railroad and Congress avenue bridges, within the City of Austin, and from an island in the river below the Congress avenue bridge, without a permit from the Game, Fish and Oyster Commission as required by Arts. 4051 and 4053, V.A.C.S. Damages were also sought for the value of gravel allegedly already taken from the bed and banks of the river and from the island; but this phase of the controversy was eliminated from the instant suit by an order of severance. The City of Austin was permitted to intervene as a party plaintiff. It was conceded that the river at the point involved was a navigable stream as defined in Art. 5302, R.C.S., and as previously so adjudicated in Swisher v. Grumbles, 18 Tex. 164, and City of Austin v. Hall, 93 Tex. 591, 57 S.W. 563, but that it was not navigable in fact; that title to the bed was therefore in the State; that defendants did not have the requisite permit to take gravel from the river bed. As regards the island, the issue was one of identity: whether that in suit was the same island title to which was adjudicated in State v. Macken, Tex. Civ.App., 162 S.W. 1160 (error refused), to be in the predecessors in title of some of the defendants. The trial was to the court and the judgment was substantially as follows:

1. The State recovered the river bed between the two bridges, the south line of which was adjudged to be a gradient line on the south bank of the river, established in accordance with a survey marked on the ground by defendants' witness Stiles.

2. Defendants were perpetually enjoined from "purchasing, taking away or disturb-

ing sand and gravel" from the river bed north of the established boundary line, without obtaining the requisite permit.

3. Defendants Janes (Janes and Janes Gravel Company) were perpetually enjoined from "purchasing, taking away or disturbing sand and gravel" in the by-pass (boundaries of which were set out) south of the island, without obtaining the requisite permit.

4. Defendants Janes were enjoined from like acts with reference to the river bed north of an established boundary line extending from the Congress avenue bridge down stream along the north and northeast margin of the island.

5. Plaintiffs were adjudged to take nothing upon their claim of servitude in the south bank of the river between the two bridges.

6. All other sought relief was denied; and all costs were adjudged against plaintiffs.

The State and City have appealed.

Appellants present five points which assert error in the following particulars:

1. In limiting the injunction (Item 2 above) to the area north of the Stiles' gradient line between the Congress avenue bridge and a point designated as Station 16, Janes Survey.

2 and 3. In denying the State's claim to servitude upon the south bank of the river.

4. In denying the sought injunction with reference to the island.

5. In adjudging the costs against the State.

Appellees Janes have cross-assigned error upon the portion of the judgment (Item 3 above) relating to the by-pass.

Upon the merits of the appeal four issues are presented: (1) the proper location of the south boundary of the river between Congress avenue bridge and Janes survey station 16; (2) the rights of the State as representative of the public or otherwise in the south bank of the river; (3) the identity of the island with that adjudicated in the Macken case; and (4) whether the bed of the by-pass was a part of the river bed.

The lands abutting upon the south bank of the river are included in the Isaac Decker League (under which defendants deraigned their respective titles), a grant by the Mexican government in 1835. The call for the north line of the league reads, "thence up the river with the meanders thereof to the entrance of Spring Creek" (now Barton creek), no meander line calls being given. The relative rights of the riparian owners on the one hand and the State on the other are governed by the civil law of Mexico at the date of the grant, as that law has been interpreted and adapted by statutes and judicial decisions of Texas. Under the Mexican civil law all streams, whether or not navigable, were public. Art. 5302 was originally enacted in 1837. It declared that "all streams so far as they retain an average width of thirty feet from the mouth up shall be considered navigable streams within the meaning" of the article. In State v. Grubstake, 117 Tex. 53, 297 S.W. 202, 205, it was held that the provisions of this article "were but adaptations of the former Mexican laws," and that the title to the beds of such streams was in the State. Under the Civil Law the beds of streams remained public only so long as occupied by the stream; and when the river changed its course, the old bed ceased to be public and belonged to the riparian owners on either side, the title of each extending to the middle of the old bed. The new bed, in turn, acquired a public character. In the later case of Manry v. Robison, 122 Tex. 213, 56 S.W.2d 438, 449, the entire subject, from the standpoint both of the civil and common law, was considered, and it was held that under the above act of 1837 and that of 1840 adopting the common law of England as the rule of decision in this State, the same rules apply to grants under the civil law, and grants made subsequently to the act of 1837. "This," the opinion reads, "makes all our grants, whether Mexican or subsequent, subject to the same rule, and prevents confusion, inconvenience, and discrimination between owners of grants made prior to the act of 1840 and those made since that date."

 In that case it was held that the title of a riparian owner is "a base fee, determinable upon the occupancy of his soil by the river," and that the title of the State to the river bed is likewise a "base or qualified" fee, "determinable in favor of the riparians upon the abandonment of the bed by the river." These principles may now be regarded as rules of property in this State. In general they are conceded by both parties. There is, however, one point of difference of view. Appellees contend

in effect that where the bed of the river is enlarged through destruction of its old bank, by the process of avulsion, as distinguished from erosion, the riparian owner does not lose title to the portion of the bed theretofore occupied by his land. We think there is no substantial basis for this conclusion. The entire change of course of a river, practically always by avulsion, invests the new bed, thus acquired, with a public character, the title to which thereupon vests in the State. The owner, riparian to the abandoned bed, does not, of course, lose his title to such land by reason of the avulsive change of course. On the contrary, his title is extended to the middle of the abandoned bed. If, however, the new bed occupies any portion of his land, he loses title thereto to the State. In like manner the enlargemnt or shifting of the river bed, whether by erosion or avulsion, defeats the title of the riparian owner to that portion of his land that is occupied by the enlarged or shifted bed. This process of enlargement or shifting of the bed may extend to complete obliteration of all land of one riparian owner, and create in other land, not theretofore riparian, the quality of riparian, so as to entitle its owner to subsequent accretions thereto and to one-half of the subsequently abandoned bed of the river, although the newly acquired land may conflict with that within the obliterated property lines of the prior riparian owner. Manry v. Robison, above. In appropriate circumstances, the riparian owner has the right to protect his land from depletion by erosive and avulsive action. But with that question we are not here concerned.

The method employed by Stiles in fixing the boundary between the State and the riparian owners on the south bank of the river was, according to his testimony, that adopted by the Supreme Court of the United States in the celebrated Red River boundary suit. See Oklahoma v. Texas, 260 U.S. 606, 43 S.Ct. 221, 67 L.Ed. 428; Id., 261 U.S. 340, 43 S.Ct. 376, 67 L.Ed. 687; Id., 265 U.S. 493, 44 S.Ct. 571, 573, 68 L.Ed. 1118. This method was held to be the correct one as applied to Texas streams, navigable under Art. 5302, in Motl v. Boyd, 116 Tex. 82, 286 S.W. 458, and Diversion Lake Club v. Heath, 126 Tex. 129, 86 S.W. 2d 441. That method is embodied in the following quotations from Oklahoma v. Texas:

"The south bank of the river is the water-washed and relatively permanent elevation or acclivity, commonly called a cut bank, along the southerly side of the river which separates its bed from the adjacent upland, whether valley or hill, and usually serves to confine the waters within the bed and to preserve the course of the river.

"The boundary between the two states is on and along that bank at the mean level attained by the waters of the river when they reach and wash the bank without overflowing it.

"At exceptional places where there is no well defined cut bank, but only a gradual incline from the sand bed of the river to the upland, the boundary is a line over such incline conforming to the mean level of the waters when at other places in that vicinity they reach and wash the cut bank without overflowing it." 265 U.S. 493, 44 S.Ct. at page 572, 68 L.Ed. at page 1119.

Stiles' testimony in brief was that he scouted on foot both banks of the river from Butler's brick yards (just up stream from the railroad bridge) to a point some 1600 ft. below Montopolis bridge, a distance of some three or four miles, and after close examination and study, "selected the places where the water would cover all of the sand bed, which of course is the bottom of the bank, and come to the foot of the bank, and rise to the top of the bank, but just not overflow it." He found six of these points which he designated "gradient boundary control points." These (all on the north bank except No. 3) were located as follows: (1) about 1600 ft. below Montopolis bridge, (2) about 500 ft. below that bridge, (3) about opposite San Antonio street, (4) about 250 ft. below Chicon street, (5) just below site of old Tinnin Ferry, and (6) about ¼ mile above the railroad bridge. The median point between the foot and top of the cut bank at these places varied from 1.3 to 1.835 ft. vertical above the foot of the cut bank. He selected No. 1 as the basis where the elevation of the median point was 1.695 ft., and laid out the boundary accordingly, driving stakes at the different stations thus established. He was one of the Commissioners appointed by the Federal Supreme Court to lay out designated portions of the Red river south boundary in accordance with the above formula. That he followed the same formula here is apparent from his testimony, with the possible exception that he did not take into account variations in the width of the stream at his several control points,

which, he testified, had no bearing upon the subject. Since, however, the boundary fixed by him, and embodied in the court's judgment, is not challenged except as to the segment between Congress avenue bridge and Janes Station 16, we need not further consider his testimony except as related to that segment, the greater portion of which abutted the Maufrais tract. The evidence showed that for many years prior to and continuing up to the trial, large quantities of gravel had been taken from this property adjacent to the Stiles boundary line. This was then being done by the use of a dredge operated by heavy machinery by means of a drag line. Some of the witnesses testified that some of this gravel was taken from the river bed north of the Stiles boundary, but that issue was eliminated by the severance order. In this operation excavations had been made adjacent to the Stiles boundary, creating large ponds some of which were from ten to fifteen feet deep, according to some of the witnesses. Appellees' reply brief concedes: "It was not denied that excavations had been made on the south bank of the river." Stiles' work was done in January, 1941, the trial was in May, 1942. At the time of the trial portions of the Stiles south bank were entirely cut off from the main land so that the river flowed through one or more of these excavated ponds to the south of that bank. This was shown by various photographs, and testimony of appellants' witnesses, and was conceded in appellees' brief. Stiles testified that the situation had changed since he did his work in January, 1941, "and that the water comes back up here and forms one large pond." His explanation of the situation was: "Well I had to go by appearances on the ground or the evidence I could find. I studied it very carefully, and from all the appearances I could get and the evidence, the river cut through that eventually and thus created what you refer to as an island." This so-called island was a part of the Stiles south bank in this segment. Appellees' theory is illustrated by the following cross-examination of one of appellants' witnesses:

"Q. Mr. Hale, those ponds that you are talking about up there evidently were dug out or excavated, were they not? A. Yes, sir.

"Q. Now, if those ponds had been dug near the edge of the river, and there had been a flood come along and overflowed into them, the probabilities are that it would have cut out what was left between the river and the pond—broke it out, wouldn't it? A. I assume that that would be the situation."

Appellees' witness, Mr. Leonard, who assisted Stiles, and made the maps for appellees, testified: "Since that time Mr. Maufrais has been in there excavating on that, and, of course, that has changed up considerably since this map was made. If we showed the water in there at the time this map was made now, it would be different."

Appellees' theory of this phase of the case is thus epitomized in their brief:

"The boundary between the bed and banks of a river are not necessarily permanent. They may be changed at any time by accretions or erosions but not by avulsions. The boundary commission in the Oklahoma-Texas case above referred to, recognized this fact and established the boundary of Red River accordingly. In this connection the court said:

" 'The boundary between the two states is not an unswerving line, but a river bank, and where, through the natural and gradual processes of erosion or accretion, the bank is changed, the boundary follows the change.' "

"He (Stiles) stated that there had been some changes made in the banks of the river since he fixed the boundary in 1941 but such changes were not due to accretions or erosions but were due to avulsions. Therefore, he established the boundary without reference to such avulsions. It is clear from the testimony that the changes in the bank and the holes or pools about which appellants speak, were caused by excavations made in the bank of the river, and on account of rises the river broke into such excavations, and at the time of the trial they looked like a part of the river bed, but, under the law and facts, they were clearly not a part of the river bed."

"The boundary line as fixed by Mr. Stiles and shown on defendants' Exhibits 1, 2 and 3 may be changed by either erosions or accretions but they cannot be changed by excavations made by persons owning or claiming to own the ground or territory excavated."

We cannot accept this theory. It is plain that the riparian owners have by their own acts created a situation which, either alone or in conjunction with the

natural action of the stream, has caused a change in the river bed at this point. The fact that this change was produced, primarily at least, by acts of the riparian owners does not, we think, materially affect the rights of the parties. From the above principles, deduced, we think, from the adjudicated cases, a riparian owner cannot defeat the title of the State to a newly created portion of the river bed by his own acts. Otherwise, he might change the entire course of the river by the same process as here, and then assert title to the entire new bed, thereby wholly defeating the State's title and obliterating the public character of the stream in the new bed. Independently of the title to the soil, the boundary line of which is the gradient line established as above, both the State and the riparian owner have rights in the banks of the stream. The riparian owner has at all times the right to access to the waters of the stream, and many other rights (some of which are statutory) not here involved. The State, on the other hand, has the right to have the natural banks preserved, so as to maintain the natural course of the stream. In this sense the banks are a part of the river, and the State has the right, analogous to the right of lateral support, to have preserved the portion of the banks above the boundary line, title to which is in the riparian owner, to the extent necessary to maintain the natural course of the stream. And where the riparian owner has infringed that right by voluntarily creating a situation, the necessary consequence of which is to obliterate the old bank of the river and create a new bank, his title to the new bed so created is thereby divested. There may still be portions of the narrow strip along the Stiles boundary line that are still above that line. If so, the title of the riparian owners therein has not been divested. Such portions, if they exist, are apparently inconsequential. At any rate, that is a matter for further adjudication. Appellees no doubt had the right before excavating to take such action as would have preserved the banks and protected their property from encroachment by the river. But such action was not taken by them. We sustain appellants' first point, above, and the cause will be remanded for the purpose of relocating the boundary along the south bank of the river between Congress avenue bridge and Janes Station 16, in accordance with the above formula.

Appellants' points 2 and 3 involve the rights of the State and the City, as representatives of the public or otherwise, to an easement or servitude upon the south bank of the river above the boundary line. The State's contention for such easement or servitude is predicated upon Laws 6 and 7 of Title 28 of the Partidas (copied in full in the Grubstake opinion of this court, 272 S.W. 527, at pages 528, 529), which provide that, although the banks of rivers belong to the owner of the adjoining estate, "nevertheless, every man may make use of them, to fasten his vessel to the trees that grow there, or to refit his vessel, or to put his sails or merchandise there. So fishermen may put and expose their fish for sale there, and dry their nets, or make use of the banks for all other like purposes, which appertain to the art or trade, by which they live" (Law 6); and that, although trees growing on the banks are the property of and may be cut down by the riparian owners, "yet, if at the time they are about to cut them down, they find any vessel fastened, or about to be fastened to such trees, they can not immediately cut them down, otherwise they would interfere with the right which every man has to use the banks of rivers, as is above said, but if there is no vessel fastened, nor about to be fastened to such trees by any one, then they may be cut down and converted to the owner's use" (Law 7). The Partidas were in force in Mexico in 1835. Grubstake case, above. Whether these provisions have been in any way modified or "adapted" in this State we find it unnecessary to consider, for reasons stated below.

The rights of the City are predicated upon the following provision of the original act incorporating it (2 Gammel Laws, p. 386): "The mayor and council shall have full power to make and pass such by-laws and ordinances as they shall deem necessary; * * * to regulate the wharves and levees or landing places along the banks of the River."

Appellees contend (1) that the asserted rights have no application to streams non-navigable in fact, and (2) that since the evidence showed that there are no wharves or boat landings on the river banks in question, no shipping on the river, and no one denied the right to fish from or land boats along the bank in question, appellants were not entitled to the sought injunctive relief in this regard.

 We sustain this second contention. Injunction will not be granted except where rights are invaded, denied or threatened.

As to the first, it is only necessary to say that no right asserted by the State or City in the banks of the river is brought in question, other than that to have them preserved to the extent of maintaining the stream in its natural course, above considered. To the extent that the judgment may be construed as denying that right, it is modified.

 We might add that the City showed no title to the bed of the river, since it did not have a population of 40,000 according to the 1920 census, and therefore did not come within the provisions of Art. 7467a, V.A.C.S., granting to such cities the beds of streams within their corporate limits.

As regards the island: the theory upon which the case was tried confined the issue to the sole question of identity of the island in suit with the property involved in the Macken case. Under the Partidas (Law 27, Title 28, Part III), an island formed in the bed of a river lost the public character of the bed and belonged to the riparian owners on the side of the river where it lay, or if in midstream to the riparians on either side, the dividing line being along the center of the stream. This law is not in accord with the general common law rule, which is that the title to islands formed in the bed of a river follows the title to the bed, and therefore as to streams navigable under Art. 5302 is in the State. Victoria v. Schott, 9 Tex.Civ.App. 332, 29 S.W. 681. Whether in Texas the civil law rule in this respect has been modified or "adapted" to conform to the common-law rule under the holding in Manry v. Robison, above, may still be an open question. Since that issue was not urged in the trial court by either party, we treat it as not involved here.

 As to islands detached from the mainland by changes in the river bed, the universal rule is that no change is thereby wrought in the title to the island soil. This rule is thus expressed in the Partidas (Law 28, Title 28, Part III): "Rivers are sometimes so swelled by the increase of waters that they enter upon people's estate, traverse them, and form islands there. And, notwithstanding we prescribed, in the preceding law, the manner in which islands formed in rivers are to be divided; yet it is not to be understood that those formed, in the way here spoken of, are to be so divided; for with respect to these, no one can have any right to them, except the owner of the estate within which they are formed; he preserving the dominion or property which he before had in his estate, unimpaired by such event."

 Maps of the City of Austin, dated in the latter '30's and early '40's, show a large island in the river, the upper extremity of which was at a point about on a projection south of the east line of Congress avenue. It extended some 300 or 400 yards downstream (S.E.) from that point, and appears, from these maps, to have been separated from the mainland by a branch of the river proper. To the east of this island, these maps showed another small island, which was about opposite the mouth of Waller creek (about four blocks east of Congress avenue). The course of the river downstream from Waller creek has manifestly changed substantially since these maps were made (assuming their correctness), varying from a course then practically due south to one practically due southeast. The State's theory is that the present island was formed by accretions to the smaller island shown on these maps. This theory is predicated upon its location, and the facts (1) that its upstream end is several hundred feet downstream from Congress avenue bridge, and (2) that the arm of the river separating the large island from the mainland headed at that bridge. The main issue in the Macken case was whether the depression (shown in the early maps of Austin as a branch of the river) was in 1835 in fact a part of the river, or only a slough through which the water ran only at flood stages of the river. There was a great deal of testimony on this issue, some of it extending back to 1839. While there was sharp conflict in the testimony of some of the witnesses as to conditions existing in the '50's, it largely supported the slough theory. This theory was adopted by the trial court based upon this testimony, which was corroborated by a survey in 1853 in connection with a partition of the Decker league, giving the meander line of the river, which at this point conformed very nearly to the north and east lines of the large island. The evidence showed that this slough had been largely filled in, and its upper portion thereby practically obliterated—its upper end completely so—so

that the large island (at least as to its upper portion) was no longer separated in any way from the mainland. The evidence showed conclusively that the upper end of the slough and that of the by-pass were not identical. Just how or when the upper part of the by-pass was formed is not clearly shown. One witness testified that its upper end was the result of excavation. If the property involved in the Macken case were confined to the large island of the early maps, there might be a substantial basis in support of the State's theory. But that is not the case. That was a suit for injunction to remove a fence and (as here) to prohibit the removal of gravel. The property included in the State's petition consisted of the large island, alleged to be just below the Congress avenue bridge and about 400 yards long and about 250 yards wide, and a sand bar alleged to be just southeast of the island and about 300 yards long and about 150 yards wide. The judgment decreed that this alleged sand bar was not a part of the river bed, and denied all relief sought by the State. The locations and dimensions of the island and sand bar are the same in the judgment as in the State's petition. The overall length of the island and sand bar from Congress avenue bridge to the lower end of the sand bar places the latter point approximately at the lower end of the island in suit, or in any event 300 feet or more below the lower end of the large island of the early maps and Macken suit. It should also be noted that some of the witnesses in the Macken case testified that in the '50's there was only one island in the river, the large one of the early maps. The so-called sand bar is not so described in the judgment, but is there described as permanent soil above the bed of the river. The evidence does not clearly show the location of the upper portion of the by-pass with relation to the large island and sand bar—whether it extended across the lower end of the island or upper end of the sand bar. This, however, is immaterial. The present island was clearly shown to be a part either of the sand bar or of both the sand bar and island. It was, therefore, a part of the property involved in the Macken suit, and therein adjudicated to belong to the defendants' predecessors in title. Appellants' fourth point is overruled.

We overrule appellee Janes' cross-assignment regarding the by-pass. The court found, upon ample evidence, that the by-pass had an average width of 30 feet, and thereupon held it to be a part of the river bed and the property of the State.

These appellees contend that this issue was adjudicated in their favor in the Macken case in that the court there found: "that the channel here called the by-pass was between twenty-five feet and thirty feet in average width and had precipitous high banks and the water flowed through it at times and it was dry in places at times, and the court concluded as a matter of law that at the time the Decker League was granted and at all times since, the main channel of the Colorado River has flowed and flows to the North of the land in controversy and that the call on the river front of the Decker League for the meanders of the river under the facts in this case means the meanders of the main channel of the river and would therefore include the land in controversy in the Decker League."

There are two reasons why this contention is untenable:

1. As above shown the "channel" there involved was not the same, at least as to its upper part, as the present by-pass.

2. Even were they in the same location, subsequent changes, shown now to exist, have altered the character of the by-pass and made it a part of the river bed.

These conclusions follow from what we have already said upon this subject.

As to the costs: the trial court assessed all costs against the State. This was predicated upon the fact that defendants admitted ownership of the State in the bed of the river, and the court's holding that the State had no right of easement or servitude in the land forming the bank of the river; thus in effect concluding that the State had not maintained its suit in any respect in which it was contested. This, we think, incorrect, at least to the extent that the judgment decreed that the by-pass was a part of the river bed. This issue was contested by defendants Janes both in the trial court and in this court. Under these circumstances we think the costs of the trial court should be apportioned (See Rules 131 and 141, T.R.C.P.). The branch of the suit involving the island and by-pass is clearly severable from that involving the river boundary between the two bridges, and the costs should therefore be apportioned between these two branches of the case. We hold the proper apportionment of

costs to be as follows: That the costs of both courts be equally divided between the two branches; that the one-half of the trial court costs apportioned to the island and by-pass branch be assessed one-half each against the State and defendants Janes; that the remaining one-half of the trial court costs abide the final decision of the case; that the costs of appeal be assessed one-half each against the State and the defendants claiming the land bordering the portion of the Stiles boundary between Congress avenue bridge and Janes Station 16.

That portion of the trial court's judgment fixing the south boundary of the river between Congress avenue bridge and Janes Station 16 is reversed and the cause is remanded as to that issue. That portion of the trial court's judgment denying to the State a servitude in the south bank of the river is modified to the extent above stated. The costs are assessed as above. In all other respects the trial court's judgment is affirmed. Counsel for the State are directed to draft a decree in accordance with this opinion, present it to counsel for appellees for approval as to form, and file it with the clerk within ten days hereafter. The fifteen-day period for filing motions for rehearing will date from the filing of such decree.

Reversed and remanded in part, and in part modified; in all other respects affirmed.