## STATE OF OKLAHOMA *v.* STATE OF TEXAS.

## UNITED STATES, INTERVENER.

### IN EQUITY.

No. 15, Original. Order that reports by commissioners respecting running of boundary line, etc., be filed, and limiting time for objections or exceptions, entered April 25, 1924; exceptions filed May 22, 23, 1924.—Decided June 9, 1924.

1. An application for an oil and gas lease, under the Act of March 4, 1923, which is subject to approval by the Secretary of the Interior and grantable only after the Texas-Oklahoma boundary line and the medial line of Red River shall have been settled by this Court and the property released from the existing receivership, does not confer a present and certain interest entitling the applicant to object to the report of the commissioners herein respecting the survey and location of the boundary. P. 495.
2. A practical construction of the decree herein (261 U. S. 340) adopted by the commissioners in locating the boundary along the south bank of Red River at the Big Bend Area, *held* reasonable and correct. P. 496.
3. Where, through gradual accretion occurring since the receiver took possession, the south bank of the river was extended northward, the boundary was properly located along the bank as so altered. P. 498.
4. A river-bank boundary follows natural accretion to the bank in which an artificial structure was a minor factor. P. 499.

Reports of commissioners approved.

UPON a hearing of exceptions and protests to the report of the commissioners on their survey, marking, &c., of a part of the boundary between Oklahoma and Texas.

Their report on the location of the medial line of Red River was submitted at the same time but was not objected to. See 261 U. S. 340; 262 U. S. 505; 264 U. S. 565. The decree approving the report and fixing the boundary will be found in this volume, p. 500, *et seq.* The boundary report is recited in that decree. For approval and establishment of the medial line, see post, pp. 513, 514.

*Mr. George F. Short*, Attorney General of the State of Oklahoma, for complainant.

*Mr. E. E. Blake* and *Mr. R. L. Cole* for Grand Oil and Developing Company, intervener.

MR. JUSTICE VAN DEVANTER delivered the opinion of the Court.

On April 25 last the commissioners appointed to run, survey, and mark portions of the boundary between the States of Texas and Oklahoma along the Red River under our decree of March 12, 1923 (261 U. S. 340) submitted their report covering the portion of the boundary along the Big Bend Area, and at the same time submitted their report of the survey and platting of the medial line of the river in the vicinity of the river-bed oil wells pursuant to a supplemental order of June 4, 1923 (262 U. S. 505). When the reports were received, general leave was given to parties in interest to except to the reports, or either of them, within a period of four weeks. 264 U. S. 565. Exceptions to the boundary report were presented by the State of Oklahoma, the Grand Oil and Developing Company, and William A. Fondren; and informal protests against its confirmation were received from Frank W. Thaison and J. E. Lester. No exceptions were taken to the medial line report. On May 26 a hearing before the Court was had on the boundary report; but nothing of

an evidential nature was offered in support of any of the exceptions or protests.

The informal protests by Mr. Thaison and Mr. Lester require only passing notice. They neither show that their authors have any legal interest in the location of the boundary, nor state any facts indicative of error in the work or report of the commissioners.

The exceptions of the Grand Oil and Developing Company and Mr. Fondren show that the exceptors have at best only a conjectural future interest in the location of the boundary. It is a conjectural interest because it is founded on the hope that applications which the exceptors have made for oil and gas leases of parts of the southerly half of the river bed, under the Act of March 4, 1923, c. 249, 42 Stat. 1448, will be granted by the Secretary of the Interior. And it is a future interest because it has not come into existence as yet, and because the sixth section of the act precludes the Secretary from granting such leases before the property is released from the existing receivership. Even after the release, the Secretary's authority will extend to such lands only as may lie between the interstate boundary and the medial line of the river, as the two are settled by this Court. Under present conditions, the United States has the sole proprietary interest in whatever may be within those limits, and it is not excepting to the boundary reported by the commissioners. Plainly these exceptors do not have such a present or certain interest in the subject as entitles them to complain.

We deem it proper, however, to notice one feature of Mr. Fondren's exceptions. In them he asserts that the commissioners were selected as representing respectively the United States and the State of Texas, and that counsel for the State of Oklahoma were remiss in not insisting on the selection of a third commissioner representing that State. The assertion rests on a misapprehension of what

occurred. Originally there was a purpose to select three commissioners and to direct that the boundary be surveyed and marked for its full length along the river, 539 miles. But as the southerly cut bank, held by the Court to be the true boundary, afterwards was conceded to be so well defined throughout the greater part of the distance that it need not be surveyed or marked (Par. 12 of decree, 261 U. S. 343), the Court deemed it better and in the interest of economy to commit the work on the portions of the boundary not covered by that concession to two commissioners instead of three. The two were selected by the Court as its representatives, not as representatives of any of the parties. The commissioners so understood. Counsel for Oklahoma were not remiss in the matter. Shortly after the two commissioners were selected, counsel for that State, including the Attorney General, requested that a third commissioner be selected, and the request was denied.

The State of Oklahoma of course has a legal interest in the location of the boundary and a right to except to the report, for her territorial jurisdiction is involved. Her exceptions are on two grounds. The first is, that the commissioners have not given proper effect to the sixth paragraph of the decree, 261 U. S. 340, which, with the opinion on which it was based, 260 U. S. 606, was to be their guide. A right understanding of that paragraph requires that it be read with the fifth and seventh. The three are as follows:

" 5. The south bank of the river is the water-washed and relatively permanent elevation or acclivity, commonly called a cut bank, along the southerly side of the river which separates its bed from the adjacent upland, whether valley or hill, and usually serves to confine the waters within the bed and to preserve the course of the river.

" 6. The boundary between the two States is on and along that bank at the mean level attained by the waters

of the river when they reach and wash the bank without overflowing it.

" 7. At exceptional places where there is no well defined cut bank, but only a gradual incline from the sand bed of the river to the upland, the boundary is a line over such incline conforming to the mean level of the waters when at other places in that vicinity they reach and wash the cut bank without overflowing it."

To sustain the exception, the State relies entirely on the introductory part of the report where, after setting forth the three paragraphs just quoted, the commissioners say:

" The foregoing specifications applied in the light of the opinion, admit of, and require the exercise of practical judgment in determining the line intended; but certain fundamentals, such as the following, obviously must form the final basis for the exact location of the line.

" The boundary line is a gradient of the flowing water in the river. It is located midway between the lower level of the flowing water that just reaches the cut bank, and the higher level of it that just does not overtop the cut bank. The physical top of the cut bank being very uneven in profile, cannot be a datum for locating the boundary line, but a gradient along the bank must be used for that purpose. The highest point on this gradient must not be higher than the lowest acceptable point on the bank in that vicinity. The boundary line has been determined accordingly."

We find nothing in what was thus said which indicates that the commissioners misapprehended the decree or failed to give proper effect to it; and after examining their report and the accompanying maps we think the decree was rightly construed and given full effect. The gradients used as representing the ordinary high and mean levels of the waters, when washing but not overflowing

the bank, were not unbroken lines arbitrarily projected from one end of the Big Bend Area to the other, but were broken lines adjusted to prevailing levels in relatively short sections. That course was both reasonable and practical. Within the sixteen miles along that area the river varies in width from 2200 feet to 6000 feet. Naturally the waters when entering the narrower sections choke and attain higher levels, and when entering the broader sections spread out and fall to lower levels. There is nothing in the decree to prevent a reasonable and practical solution of the problem incident to these varying water levels. And so of the problem incident to the irregularities in the elevation of the bank. The State, although excepting to the solution adopted by the commissioners, does not attempt to point out a better one. In our opinion the exception is not tenable.

The second exception is that the commissioners regarded an extensive addition to the south bank as an accretion caused by natural processes, whereas it was caused by an artificial structure placed in the river by the receiver and should have been disregarded. The facts relating to this addition to the bank, as shown by the record in this cause, various photographic exhibits produced in evidence on former hearings, and the maps accompanying the report of the commissioners are as follows:

In 1920, when the receiver took possession, a definite channel and active current were near the south bank. Four oil wells had been drilled, or were in process of drilling, in the river bed close to that bank. A short wing dam had been extended into the river above the wells. The receiver made a change in the wing dam and extended it down stream in front of and near the wells. Winds in dry weather and the water during rises in the river commenced to deposit sand and other material behind the dam and about the wells. But quite inde-

pendently of the dam the river shortly thereafter washed away a large section of the opposite bank on the north and shifted its principal channel to that side. The channel on the south side soon filled with sand. The river continued gradually to erode the north bank, and at the same time there was a gradual but slower accretion to the south bank. In this way the river moved northward, the north bank being cut away as much as 1400 feet from where it was in 1920 and an accretion from 60 to 80 feet in width being added to the south bank of that period. The change is apparent when Map Exhibit No. 26 produced by the United States and Oklahoma on the principal hearing in this case is compared with the maps accompanying the commissioners' report. The 60 or 80 feet of accretion has come to be of the same elevation as the former bank, has similar vegetation on it where oil or oil operations have not been in the way, and otherwise appears to be stable land. The process of accretion is still active and now the new formation slopes, for 200 feet beyond the stable accretion, into the river bed and has the appearance of a sandy shore. The commissioners regarded the south bank as carried to the outer line of the 60 or 80 feet, and located the boundary accordingly. Their location was based on the situation existing December 31, 1923.

On the facts disclosed, we think the commissioners were right. The boundary between the two States is not an unswerving line, but a river bank; and where through the natural and gradual processes of erosion or accretion the bank is changed the boundary follows the change. We so said in the opinion and decree which were to guide the commissioners. The wing dam was at most a minor factor in producing the accretion and does not take the change out of the general rule. *County of St. Clair* v. *Lovingston,* 23 Wall. 46. We accordingly overrule the exception.

Both reports will be approved and a decree will be entered giving effect to the boundary along the Big Bend Area as run, surveyed and marked by the commissioners.