C. A. Maufrais et al v. The State of Texas et al.

No. 8202. Decided April 5, 1944.
Rehearing overruled May 24, 1944.
(180 S. W., 2d Series, 144)

*Dan Moody,* of Austin, for C. A. Maufrais and others; *Ike D. White* and *H. Grady Chandler,* both of Austin, for Janes Gravel Co., petitioners.

In regard to the proper location of the boundary lines and as to the acts of the parties cutting into the river bank so that the river flowed through one or more of these excavations to the south of said bank, causing a change in the river bed,

petitioners cite Buttenuth v. St. Louis Bridge Co., 123 Ill. 535, 17 N. E. 439; Alabama v. Georgia, 64 U. S. 505; Heard v. Town of Refugio, 103 S. W. (2d) 728.

*Grover Sellers*, Attorney General of Texas, *Ocie Speer, Fagan Dickson* and *J. M. Patterson, Jr.*, Acting City Attorney of Austin, for respondent.

MR. JUSTICE SHARP delivered the opinion of the Court.

This is a suit by the State of Texas against C. A. Maufrais and others, to enjoin them from mining, excavating, and removing the south or right bank of the Colorado River in the City of Austin between South First Street and the Congress Avenue bridge, and from purchasing, taking away, or disturbing sand and gravel from the bed of the river without a permit from the Game, Fish and Oyster Commissioner, for an accounting, and for damages. By an order of the trial court the cause was consolidated with No. 64,385, State of Texas v. R. E. Janes Gravel Company, Inc., et al., and the City of Austin was permitted to intervene as a party plaintiff. The suit against Janes Gravel Company, Inc., involved, aside from the common question of the boundary of the river, the question of title to a large island below the Congress Avenue bridge and the bed of the by-pass which separates it from the mainland. All issues of accounting and damages for sand and gravel wrongfully taken were eliminated from the case by an order of the trial court. The case was tried before the court without a jury, and the substantial parts of the judgment of the trial court are as follows:

1. The State recovered the river bed between the International and G. N. R. R. bridge and a point which is the extreme limit of the property of Janes Gravel Company, Inc., below the Congress Avenue bridge; the south line of the river was decreed to be a gradient line on the south bank of the river as defined in the judgment.

2. Defendants were perpetually enjoined from "purchasing, taking away, or disturbing sand and gravel" from the river bed north of the established boundary line, and from the by-pass south of the island, the boundaries of which are specifically described in the judgment, without obtaining the requisite permit from the Game, Fish and Oyster Commissioner.

3. Defendants were enjoined from like acts with reference

to the river bed north of the established boundary line extending from the Congress Avenue bridge downstream along the north and northeast margin of the island.

4. Plaintiffs were adjudged to take nothing upon their claim of servitude in the south bank of the river between the two bridges. All other relief sought by plaintiffs was denied, and all costs were taxed against the State.

5. It was further decreed that such judgment was rendered without prejudice to the State of Texas to proceed against the defendants for an accounting for the sand and gravel wrongfully taken from the bed of the river.

The State excepted to the location of that portion of the boundary line which lies between Janes Station 17 and the Congress Avenue bridge, which points are the limits of the Maufrais property. Janes Gravel Company, Inc., excepted to so much of the judgment as enjoined it from taking sand and gravel from the by-pass south of the island. The State of Texas and the City of Austin appealed to the Court of Civil Appeals, and Janes Gravel Company, Inc., cross-assigned as error the action of the trial court in decreeing that title to the bed of the by-pass was in the State. The Court of Civil Appeals reversed and remanded that part of the judgment which fixed the boundary of the river between Janes Station 17 and the Congress Avenue bridge, modified the judgment in so far as it could be construed as denying the State the right to have the river maintained in its natural course, and in all other respects affirmed the judgment of the trial court. We refer to the opinion of the Court of Civil Appeals for an exhaustive statement of the facts and issues presented in this case and the judgment rendered by that court. 175 S. W. (2d) 739.

C. A. Maufrais et al, filed an application for a writ of error, which was granted on the importance of the question, in which was assigned as error the action of the Court of Civil Appeals in reversing and remanding the cause for the purpose of relocating the boundary of the river between Janes Station 17 (which is a short distance west of South First Street) and the Congress Avenue Bridge.

The trial court filed findings of fact and conclusions of law substantially as follows:

(a) That the land in controversy is a part of the Isaac Decker League, granted to Isaac Decker by the States of Coa-

huila and Texas in 1835, and that the defendants owned the land involved herein.

(b) That the land claimed by defendants constitutes the south bank of the Colorado River fronting on said land, and that the field notes described in the judgment found the north boundary line of the property of the defendants and marked the boundary between the bed and the banks of the Colorado River.

(c) That the north line of the land belonging to the defendants is specifically described in the judgment, and reference is made to same. The boundary line of the land of the defendants R. E. Janes Gravel Company, Inc., and R. E. Janes along the said island and below the Congress Avenue bridge is set out in the judgment of the court and referred to.

(d) That the stream marked on Exhibit 1 "By-pass" has an average width of 30 feet and belongs to the plaintiffs, and is located down stream from the Congress Avenue bridge and is described by field notes in the judgment.

(e) That defendants admitted that the State of Texas owned the bed of the Colorado River.

(f) That the Colorado River is navigable in law, but not in fact. That no one has been denied the right to fish from or land boats along the banks of the river forming the north boundary line of this land. There are no wharves or boat landings on the Colorado River front or on the land of the defendants, and there are no boats or shipping on the river in the vicinity of defendants' land.

(g) That the only issue tried in this case was the location of the boundary line of the land of defendants and the boundary of the bed of the Colorado River. There was no issue involved as to whether the defendants had taken any sand or gravel from the bed of the river.

(h) That the large island down the river from the Congress Avenue bridge is a part of the Isaac Decker League, and was so adjudicated in the case of State of Texas v. Macken et al., (Civ. App.), 162 S. W. 1160 (writ refused), and the State of Texas has no right or title therein.

The trial court concluded that the State of Texas owns the bed of the Colorado River and the bed of the by-pass, and

enjoined the defendants from taking sand or gravel from said beds, and that neither the State of Texas nor the City of Austin has an easement or right of servitude in or upon the land of defendants bordering on the bed of the Colorado River.

The City of Austin did not come within the provisions of Article 7467a, Vernon's Annotated Civil Statutes, granting to cities the beds of streams within the corporate limits of said cities, since said city did not have a population of 40,000 according to the 1920 census. Therefore the City of Austin cannot make any claim to the bed of the Colorado River here.

Since no petition for a writ of error has been filed on behalf of the Janes Gravel Company, Inc., the State, or the City, the issues relating to the island and by-pass below the Congress Avenue bridge are not before this Court. The one important question remaining in the case is whether, in a case where the riparian owner has made excavations in the bank and the river has broken into such excavations and passed out at the lower end, the title to the bed of the channel thus created vests in the State. In connection with this question, it must also be decided whether title to parts of the old bank left in the stream remains in the riparian owners or vests in the State.

Petitioners contend that the Court of Civil Appeals erred in holding that the trial court improperly located the south boundary line of the Colorado River between Janes Station 17 and the Congress Avenue bridge over the Colorado River, and in finding that defendants had by their own acts created a situation which, either alone or in conjunction with the natural action of the river, caused a change in the river bed at that point. Petitioners in their application for writ of error say: "We cannot dispute, and we do not dispute the Court's proposition of law that if a river takes a new channel as a result of avulsion, that the State has title to the new channel." But it is contended that there was no evidence that the river, at normal flow, passed through the excavations made by petitioners.

On the other hand, it is contended that the State has the right to have preserved the portion of the banks above the boundary line, title to which is in the riparian owners, to the extent necessary to maintain the natural course of the river; and where the riparian owners have infringed that right by voluntarily creating a situation the necessary consequences of which are to obliterate the old bank of the river and create a new bank, their title to the new bank is thereby divested.

■ In 1837 there was enacted what is now known as Article 5302, Vernon's Annotated Civil Statutes, defining navigable streams and prescribing the manner of surveying public lands lying on such streams, and such Article provides that: "All streams so far as they retain an average width of thirty feet from the mouth up shall be considered navigable streams, * * * ."

The rule announced in the foregoing article has prevailed since its adoption by the Republic of Texas in 1837. This article has been construed many times by this court, and this Court has stated in detail as to the test of defining a navigable stream and its bed in this State. Motl v. Boyd, 116 Texas 82, 286 S. W. 458; Hoefs v. Short, 114 Texas 501, 273 S. W. 785, 40 A. L. R. 833; State of Texas v. Bradford, 121 Texas 515, 50 S. W. (2d) 1065; Diversion Lake Club v. Heath, 126 Texas 129, 86 S. W. (2d) 441.

In the case of Motl v. Boyd, supra, a navigable stream was defined in the following language:

"The bed of a stream is that portion of its soil which is alternately covered and left bare as there may be an increase or diminution in the supply of water, and which is adequate to contain it at its average and mean state during an entire year, without reference to extra freshets of the winter or spring or the extreme drouths of the summer or autumn."

This definition is in complete harmony with the definition given to navigable streams by the Supreme Court of the United States. Alabama v. Georgia, 23 Howard (U. S.) 505, 16 L. Ed. 566; Oklahoma v. Texas, 260 U. S. 606, 43 Sup. Ct. 221, 67 L. Ed. 428; 261 U. S. 340, 43 Sup. Ct. 376, 67 L. Ed. 687; 265 U. S. 493, 44 Sup. Ct. 571, 68 L. Ed. 1118; Howard v. Ingersoll, 54 U. S. (13 How.) 381, 14 L. Ed. 189.

In Oklahoma v. Texas, supra, the Supreme Court of the United States, in arriving at the true boundary line between the two States, approved certain rules to determine the bed of the Red River. We quote the rules adopted in that opinion applicable to that river as follows:

"The south bank of the river is the water-washed and relatively permanent elevation or activity, commonly called a cut bank, along the southerly side of the river, which separates its bed from the adjacent upland, whether valley or hill, and usually serves to confine the waters within the bed, and to preserve the course of the river.

"The boundary between the two States is on and along that bank at the mean level attained by the waters of the river when they reach and wash the bank without overflowing it.

"At exceptional places where there is no well defined cut bank, but only a gradual incline from the sand bed of the river to the upland, the boundary is a line over such incline conforming to the mean level of the waters when at other places in that vicinity they reach and wash the cut bank without overflowing it.

\*  \*  \*  \*  \*  \*  \*  \*  \*  \*

"The boundary line is a gradient of the flowing water in the river. It is located midway between the lower level of the flowing water that just reaches the cut bank, and the higher level of it that just does not overtop the cut bank."

These rules were followed with approval in the cases of Motl v. Boyd, supra, and Diversion Lake Club v. Heath, supra.

The State is the owner of the soil underlying navigable streams. State v. Bradford, supra, and cases cited; State v. Grubstake Investment Assn., 117 Texas 53, 297 S. W. 202; 44 Tex. Jur., p. 93, sec. 73.

State v. Grubstake Investment Assn., supra, involved the contention that those who held under grants from Coahuila and Texas issued in 1835 owned the title to the land to the middle of the Frio River, and were entitled to the minerals therein. The precise question presented in that case for decision was whether a grant to land bordering on a river, made by the Mexican Government in 1835, carried title to the middle of the stream. Mr. Justice Greenwood wrote the opinion for this Court, and after reviewing many authorities dealing with this question held that title to the river bed was in the State, and announced the following rules:

"Considering all the terms of the Partidas dealing with rivers, their beds and their banks, we are constrained to conclude:

"First: That the owner of riparian land granted by Coahuila and Texas in 1835 became invested with no title to any portion of the river bed.

"Second: That while such owner acquired title to the river bank, yet such title was burdened with certain servitudes.

"Third: That the title to the river bed remained in the sovereign despite the riparian grant.

"Looking directly to that part of the Partidas dealing specifically with titles to river beds, we find the following provisions in Law 31, Title 28, Third Partida, viz.:

" 'When a river changes its course, to whom will belong the bed where it formerly ran? Rivers sometimes take new courses, abandoning their former beds and leaving them dry. And as disputes may arise about the right of property to the ground thus left, we say it will belong to the owners of the adjoining lands, in proportion to the extent of their estates upon the banks. And the owners of the lands through which the river makes its new bed, will lose the property in the soil it covers, which will now be of the same nature of the former bed, and will, like the river itself, vest in the public.'

"The express purpose of Law 31 is to make plain the ownership of river beds. It defines the status of the title; first, to the bed of the river with the waters flowing along it; second, to the bed after its abandonment by the waters of the river; and third, to the bed along a new course carved out by the river. It vests title to the bed along which a river runs in the public. It provides that the adjoining owners will acquire title to ground left dry by a change in the river's course in proportion to their estates on the banks. Finally it declares that the instant a river cuts a new bed through land owned by a person in fee simple, such person loses his title to so much of his land as is occupied by such new bed. None of these declarations is consistent with the claim that the owner of riparian land takes title to the center of the river."

It clearly appears that in this case the trial court located the south boundary line of the Colorado River between Janes Station 17 and the Congress Avenue bridge, based upon the testimony of Honorable A. A. Stiles, who for many years was the State Reclamation Engineer of Texas. Mr. Stiles was one of the commissioners appointed by the Supreme Court of the United States to help locate the boundary line between Oklahoma and Texas, which was adjudicated in Oklahoma v. Texas, supra. Stiles testified that he ran his boundary so as to include a small island directly north of South First Street and the water between it and the mainland, because the island had been cut off from the mainland by an avulsion.

The rule is generally accepted that the owner of land abutting on a stream, whether navigable or not navigable, is

ordinarily entitled to claim any accretion to his land created by the gradual and imperceptible operation of the water. This rule applies to streams that are the boundary between two states or nations, unless there is something in the treaties between the states or nations that controls or limits its application. 44 Tex. Jur., p. 98, sec. 76; 67 C. J., p. 825, sec. 239. For an exhaustive treatise of the rights of riparian owners see Texas Law Review, Vol. 6, p. 19, and Vol. 7, p. 493. The authorities are not so uniform in holding who is entitled to land created by avulsion, but the great weight of authority, as shown by the decisions in many cases, is to the effect that when avulsion occurs the line dividing the property of riparians remains according to the former boundaries, and not according to the boundaries created by the avulsion. 44 Tex. Jur., p. 98, sec. 76; 67 C. J., p. 828, sec. 239.

■ However, in this State it has been held that where a navigable river by the process of avulsion leaves its old bed and cuts a new bed through land owned by a person in fee simple, such person loses his title to so much of his land as is occupied by such new bed, and the riparian owners of land abutting on the abandoned bed are entitled to claim such abandoned bed. Manry v. Robinson et al., 122 Texas 213, 56 S. W. (2d) 438. It logically follows that where a navigable river by avulsion cuts a new bed in addition to its old bed, and part of the normal flow of such river flows through such new bed, the owner of the land loses his title to so much of his land as is occupied by such new bed; but he does not lose his title to the land originally owned by him lying between the new and old beds.

Chief Justice McClendon in his opinion in this case sets out the substantial parts of the testimony of the witnesses, and some of the contentions contained in petitioners' brief filed in that court, and we quote the following from that opinion:

"The evidence showed that for many years prior to and continuing up to the trial, large quantities of gravel had been taken from this property adjacent to the Stiles boundary line. This was then being done by the use of a dredge operated by heavy machinery by means of a drag line. Some of the witnesses testified that some of this gravel was taken from the river bed north of the Stiles boundary, but that issue was eliminated by the severance order. In this operation excavations had been made adjacent to the Stiles boundary, creating large ponds some of which were from ten to fifteen feet deep, according to some of the witnesses. Appellees' reply brief concedes: 'It

was not denied that excavations had been made on the south bank of the river.'

\* \* \* \* \* \* \* \* \* \* \* \*

"Appellees' theory of this phase of the case is thus epitomized in their brief:

\* \* \* \* \* \* \* \* \* \* \* \*

" 'He (Stiles) stated that there had been some changes made in the banks of the river since he fixed the boundary in 1941 but such changes were not due to accretions· or erosions but were due to avulsions. Therefore, he established the boundary without reference to such avulsions. It is clear from the testimony that the changes in the bank and the holes or pools about which appellants speak, were caused by excavations made in the bank of the river, and on account of rises the river broke into such excavations, and at the time of the trial they looked like a part of the river bed, but, under the law and facts, they were clearly not a part of the river bed.'

" 'The boundary line as fixed by Mr. Stiles and shown on defendants' Exhibits 1, 2 and 3 may be changed by either erosions or accretions but they cannot be changed by excavations made by persons owning or claiming to own the ground or territory excavated.' "

The Court of Civil Appeals rejected this theory on substantially the following grounds: (1) That the riparian owners cannot defeat the title of the State to a newly created portion of a river bed created by their own acts; (2) that it is plain that the riparian owners by their own acts created a situation which, either alone or in conjunction with the natural action of the river, has caused the river to change its bed at this point, and if this were permissible the entire course of the river could be changed and the State would lose title to such new bed; (3) that both the State and the riparian owners have certain rights in the banks of the river, and the riparian owners have access to the waters of the river, and the State has the right to have the natural banks preserved so as to maintain the natural course of the river. We further quote from the opinion of the Court of Civil Appeals as follows:

"And where the riparian owner has infringed that right by voluntarily creating a situation, the necessary consequence of which is to obliterate the old bank of the river and create a new bank, his title to the new bed so created is thereby divested.

There may still be portions of the narrow strip along the Stiles boundary line that are still above that line. If so, the title of the riparian owners therein has not been divested. Such portions, if they exist, are apparently inconsequential. At any rate, that is a matter for further adjudication. Appellees no doubt had the right before excavating to take such action as would have preserved the banks and protected their property from encroachment by the river. But such action was not taken by them."

The Court of Civil Appeals remanded the cause for the purpose of relocating the boundary along the south bank of the river between Congress Avenue and Janes Station 17.

The Stiles gradient line which was adopted by the trial court in this case was run in November, 1941. Defendants' Exhibit No. 2, which shows the gradient line together with the water line at that time, shows that part of the bank included within the gradient line was separated from the mainland by flowing water.

■ Petitioners and respondents both seem to concede that part of the bank located by Stiles is cut off from the mainland, and that there are certain large excavations a short distance south of the bank located by Stiles; and the State's theory, which was adopted by the Court of Civil Appeals, is that the river during a large rise, after the Stiles boundary was fixed, broke into the excavations and passed out at the lower end, with the result, as we understand the record, that part of the normal flow of the water in the river now flows through the excavations. This raises certain questions which should be determined in order to establish the rights of the parties. The State and the riparian owners have certain rights in the banks of the river, and are entitled to have them undisturbed. Under the facts developed in this case it is impossible to announce a definite rule fixing the liability of the riparian owners for disturbing the banks of the river at this point, and the necessary consequences flowing therefrom. Since it appears that the trial court excluded from its consideration of the case any changes made in the river by avulsion, or whether acts of the riparian owners had caused the river to cut a new bed, we think this question should be remanded to the trial court for determination.

■ In view of the judgment of the trial court that the State was not entitled to claim a servitude or easement on the right or south bank of the Colorado River, and since this case will be remanded for further proceedings, we desire to quote

the rule announced by this Court in Diversion Lake Club v. Heath, supra. After stating the general rules controlling the fixing of a boundary line of a river, Judge Smedley, in discussing the rights of the public to use the banks of a stream for fishing purposes, said:

"Because of the State's ownership of the beds of statutory navigable streams and of their banks up to the line as above defined, the public may use their beds and their banks up to such line for fishing. Beyond that line, unless the rule of the civil law is applied, they have no right to go without the consent of the riparian landowner. Herrin v. Sutherland, 74 Mont. 587, 241 Pac. 328, 42 A. L. R. 937; Farnham on Water and Water Rights, Vol. 1, p. 659, 661-662; 11 R. C. L., p. 1033."

As to the portions of petitioners' land, if any, that have been left in the channel of the river, the Court of Civil Appeals correctly held that title remains in the riparian owners. It is true that the rule has been laid down that islands formed in a navigable stream belong to the State. City of Victoria v. Schott, 9 Texas Civ. App. 332, 29 S. W. 681; 7 Tex. Jur., p. 137, sec. 19; Thompson on Real Property (1940), Vol. 5, sec. 2552. The reason for the rule is that title to islands follows the title to the bed of the river upon which they are formed. So, if an island is built upon the State-owned bed of the river, the island must belong to the State. But where, as in this case, the island is formed by cutting off part of the riparian owner's land, the State owns only that part of the land used by the river for its bed, and the title to the remainder of the land remains in the riparian owner. This distinction is pointed out by the following quotation from City of Victoria v. Schott, supra:

"The islet, when formed, was an accretion to the soil in the bed of the stream, and the owner of such bed became the owner of the accretion. In navigable streams, the soil, and hence all islands formed upon it, belong to the sovereign."

In view of the reason for the rule above mentioned, and the possibility that very large portions of a riparian owner's land might be surrounded by a river, it seems more sound to hold that islands created by an avulsive change in the course of a river do not belong to the State.

For the reasons given, the judgments of the trial court and the Court of Civil Appeals, with respect to the location of the boundary between Janes Station 17 and the Congress

Avenue bridge, being that phase of the case between the State of Texas and C. A. Maufrais, C. B. Maufrais, Henry L. Maufrais, S. B. Ricks, and Walter C. Moore, are reversed, and the cause is remanded for further proceedings not inconsistent with this opinion.

Opinion delivered April 5, 1944.

Rehearing overruled May 24, 1944.