The STATE of Texas, et alius, Appellants,

v.

E.H. BRAINARD, II, et al., Appellees.

No. 07–96–0231–CV.

Court of Appeals of Texas, Amarillo.

Feb. 10, 1998.

Opinion Overruling Rehearing May 5, 1998.

Dan Morales, Atty. Gen., Austin, Jorge Vega, First Asst. Atty. Gen., LaQuita A. Hamilton, Deputy Atty. Gen., for Litigation, Hal R. Ray, Jr., Asst. Atty. Gen., Chief Natural Resources Div., Priscilla M. Hubenak, Mary A. Keeney, Asst. Attys. Gen.,. for appellants.

Michael V. Powell, Locke, Purnell, Rain and Harrell, Dallas, Jody Sheets, D. Clay Holcomb, Sheets & Holcomb, Amarillo, for appellees.

Before BOYD, C.J., REAVIS, J., and REYNOLDS, Senior Justice.*

CHARLES L. REYNOLDS, Senior Justice (Retired).

The State of Texas and its General Land Office perfected this appeal to challenge a judgment by which the trial court summarily determined the boundaries of the Canadian River abutting certain described real properties located in Hutchinson and Roberts Counties and, accepting a jury verdict, assessed attorney's and surveyor's fees against the General Land Office. Because unresolved material fact issues preclude the summary adjudication, and the award of fees was not authorized, we will reverse and remand in part and reverse and render in part.

Beginning in the Sangre de Cristo Mountains in northeastern New Mexico, the Canadian River traverses the Texas Panhandle, including Hutchinson and Roberts Counties, on its course to join the Arkansas River in eastern Oklahoma. In 1962, construction of the Sanford Dam, situated on the river some fourteen miles west of the nearest property involved in the boundary dispute, was commenced to impound waters of the river in Lake Meredith to supply water to city members of the Canadian Municipal Water Authority and to provide flood control for the region. At the site, the water in the river flowed over an area approximately 2,500 feet wide and, at that time, there was a wide variation of the annual flow of water in the river due to erratic occurrences of floods, with the river occasionally being dry for considerable periods.

The dam was completed in 1965, its flood gates were closed, and no controlled release of the impounded waters has occurred. The volume of water flowing downstream from the site of the dam before its construction was immediately and drastically reduced after the flood gates were closed since only about three to five percent of the annual inflow behind the dam escapes as seepage. The impoundment of water behind the dam produced physical changes in the riverbed below the dam of less water and more vegetation.

The narrowing of the general width of the flowing water in the river downstream from the dam produced confusion and uncertainty as to the location of the boundary lines between the Canadian River and certain designated surveys in Hutchinson and Roberts Counties with patented field notes calling for a common boundary with the river. The State of Texas, supported by an attorney general's opinion, claimed that the dam did not alter the bed of the river as it existed before the dam was constructed; certain owners of land adjacent to the river contended that the boundary of the river must be

* Charles L. Reynolds, Chief Justice (Ret.), Seventh Court of Appeals, sitting by assignment.

determined by a survey of the present day conditions of the river.

This situation prompted the Legislature's 1989 adoption of a Senate concurrent resolution, by which permission to sue the State of Texas and the General Land Office to determine and establish the boundary line between the described surveys and the river was granted to E.H. Brainard, II and others,[1] and to any intervenor found by the court to be a proper party.[2] Tex. S. Con. Res. 165, 71st Leg., R.S., 1989 Tex. Gen. Laws 5909. In granting permission to sue, the Legislature resolved:

> That any final judgment adjudicating the title dispute in a suit brought concerning title to boundaries of the Canadian River under this resolution shall be limited to settling the title dispute and may not authorize an award of monetary damages or attorney's fees....

*Id.* at 5910.

Pursuant to the resolution, Brainard and others (collectively, Brainard) initiated the action underlying this appeal in Roberts County. The issue of the location of the boundaries of the Canadian River, a navigable stream under Texas law but not in fact, was joined by the State of Texas and the General Land Office (collectively, the State). On the boundary issue, Brainard moved for partial summary judgment, and the State moved for summary judgment, primarily on the strength of boundary surveys performed respectively by W.C. Wilson, Jr. for Brainard, and Darrell Shine for the State, both of whom are licensed in Texas as professional land surveyors. Brainard also pleaded for attorney's and surveyor's fees.

After a venue change to Hutchinson County, the trial court granted Brainard's motion to exclude the survey performed by the State's surveyor Shine and testimony related thereto on the theory that the pre-dam boundary was legally incorrect and irrelevant, and found Brainard was entitled to judgment establishing that the survey performed by Wilson accurately depicted the gradient boundary of the Canadian River. Presenting the questions of attorney's and surveyor's fees to a Collingsworth County jury on another change of venue, the court accepted the jury's verdict fixing the sums of $144,000 as surveyor's fees, $350,000 as attorney's fees for trial, $15,000 as attorney's fees for an appeal to the court of appeals, and $5,000 as attorney's fees for an appeal to the Supreme Court.

The court granted Brainard's post-trial motion for prejudgment interest. Then, the court rendered a final judgment establishing the boundaries of the Canadian River as depicted in the Wilson survey, and decreed recovery by Brainard from the General Land Office of $238,507.73 as surveyor's fees, $579,706.29 as attorney's fees, together with an additional $15,000 for an appeal to the court of appeals and $5,000 for an appeal to the Supreme Court, with post-judgment interest.

Utilizing six points of error, the State charges the trial court with error (1) in granting summary judgment for Brainard, because (4) the location of the boundary by Wilson is premised on incorrect legal principles, and (5) fact questions exist as to the correctness and accuracy of his survey. The State also charges the court with error (3) in holding the testimony of the State's witnesses was inadmissible, and (2) in denying

**1.** The others named in the resolution are John F. (Jack) Allen, Ruth Wilson, Barbara Woodward Lips, Morrison Cattle Company, Boone and Bea Pickens, and Catherine C. Whittenburg Trusts. Named in the final judgment as plaintiffs (1) in lieu of John F. (Jack) Allen are John Douglas Allen, individually, as Trustee of the Allen Family Revocable Trust, and as Trustee of an Irrevocable Trust FBO Virginia M. Allen; and Louise Antoinette Allen, Trustee of the Allen Family Revocable Trust; and (2) in lieu of Ruth Wilson are Carolyn Rogers and Nancy Brisco, Co–Independent Executrices of the Estate of Ruth Wilson. Named in the final judgment as additional plain-

tiffs are Bonnie K. Loopesko; Winifred R. Wardle; and John R. Ydren, Trustee of the John R. Ydren Revocable Trust.

**2.** Intervening were E.S.F. Brainard; Benjamin McIntyre; Mary Katherine Christner; B & W Ranch Company, a limited partnership; J & W Ranch Company, a limited partnership; Patricia Noel Kennedy and Wiley Reynolds, Jr., co-executors of the estate of Wiley Reynolds, and Albert Reynolds; Francis H. Morrison; J.A. Whittenburg III; Frances Whittenburg Klein; and Catharine W. McAnally.

the State's motion for summary judgment, because as a matter of law Shine's survey correctly locates the boundary of the river. Finally, the State charges the court with error (6) in awarding Brainard recovery of attorney's and surveyor's fees, and (7) in awarding prejudgment interest thereon. Brainard has three cross-points, conditionally presented in the event of a reversal, to challenge the trial court's change of venue from Roberts County to Hutchinson County.

The parties accept that the correct methodology for marking the boundaries between the lands of Brainard and other parties and the river is to establish the gradient boundaries as articulated in *Oklahoma v. Texas*, 260 U.S. 606, 43 S.Ct. 221, 67 L.Ed. 428 (1923), 261 U.S. 340, 43 S.Ct. 376, 67 L.Ed. 687 (1923), and 265 U.S. 493, 44 S.Ct. 571, 68 L.Ed. 1118 (1924), and applied in Texas. *See, e.g., Maufrais v. State*, 142 Tex. 559, 180 S.W.2d 144, 147–48 (1944); *Motl v. Boyd*, 116 Tex. 82, 286 S.W. 458, 467 (1926).[3] The theory and plan of the gradient boundary was attributed to Arthur A. Stiles, 30 Tex. L.Rev. 305,[4] one of two cadastral engineers designated as commissioners by the Supreme Court to locate and mark upon the ground the boundary line between the states of Texas and Oklahoma along the Red River. 261 U.S. at 343, 43 S.Ct. at 377.

"The boundary line," according to Stiles, "is a gradient of the flowing water in the river ... located midway between the lower level of the flowing water that just reaches the cut bank and the higher level of it that just does not overtop the cut bank," and "the gradient boundary was finally established and fixed at the mid-height point of the lowest 'acceptable' or qualified bank in the vicinity." 30 Tex. L.Rev. at 309. Thus, "[t]he height of the gradient boundary is determined by the bank of the river, not by

the water in the river." *Id.* at 310. The boundary was established in obedience to the Court's conclusion that the bank of the Red River, and not the river itself, was the boundary provided by treaty, and its holding that

> the bank intended by the treaty provision is the water-washed and relatively permanent elevation or acclivity at the outer line of the river bed which separates the bed from the adjacent upland, whether valley or hill, and serves to confine the waters within the bed and to preserve the course of the river, and that the boundary intended is on and along the bank at the average or mean level attained by the waters in the periods when they reach and wash the bank without overflowing it. When we speak of the bed, we include all of the area which is kept practically bare of vegetation by the wash of the waters of the river from year to year in their onward course, although parts of it are left dry for months at a time; and we exclude the lateral valleys, which have the characteristics of relatively fast land, and usually are covered by upland grasses and vegetation, although temporarily overflowed in exceptional instances when the river is at flood.

260 U.S. at 631–32, 43 S.Ct. at 224–25. The "bank" referred to by the Court was later described as "a clearly defined water-worn bank, designated by witnesses and counsel as a cut bank." 260 U.S. at 634, 43 S.Ct. at 225–26.

In his article, Stiles explained that the expression "cut bank" was used in the opinion, in the decree of the Court, and in the report of the boundary commissioners, as a designation and not in any sense as a restrictive qualification of the bank intended as the boundary bank, 30 Tex. L.Rev. at 312, be-

---

3. Comments in *Motl v. Boyd* of a riparian right to irrigate land in Texas were held to be dicta not amounting to stare decisis when, for the first time, the question whether Spanish and Mexican land grants along the Lower Rio Grande have appurtenant riparian irrigation rights was presented for decision, which was that the grants were not made with the implied intent or agreement that the right to irrigate was appurtenant to the lands. *State v. Valmont Plantations*, 346 S.W.2d 853, 879, 881 (Tex.Civ.App.—San Antonio 1961), *aff'd & opn adopted, Valmont Planta-*

*tions v. State*, 163 Tex. 381, 355 S.W.2d 502, 503 (1962).

4. The citation is referenced to Arthur A. Stiles, *THE GRADIENT BOUNDARY—LINE BETWEEN TEXAS AND OKLAHOMA ALONG THE RED RIVER*, 30 Tex. L.Rev. 305 (1952), with a forward by Honorable Graham B. Smedley, Associate Justice of the Supreme Court of Texas, as are future citations to the volume and page numbers.

cause when the expression was used, "the Court was not cognizant of the gradient boundary." Instead, he continued, "[t]he boundary bank is an erosion bank here; an accretion bank there; and a transverse slope yonder." *Id.* at 313. Yet, he expounded, the erosion bank is purely accidental, the direct result of destruction by the river and, because it is the bank that was, not the bank that is, it is comparatively seldom that the correct height of the gradient boundary can be determined from it. *Id.* at 314. On the other hand, the accretion bank, built with material conveyed and deposited by the water in the river, is fundamentally consistent and is generally the only bank from which the height of the gradient boundary can be determined, since it cannot be determined from transverse slopes. *Id.* at 314–15.[5]

Since Sanford Dam was erected as a source of water supply and flood control, it may be assumed that it was not constructed for the purpose of changing the bed of the Canadian River below the dam. Nevertheless, changes in a riverbed occur as the natural result of abandonment, erosion, accretion and reliction. *Manry v. Robison*, 122 Tex. 213, 56 S.W.2d 438, 444 (1932).

Almost thirty years after the construction of the dam, Shine and Wilson, each representing that he had followed the Stiles methodology of establishing the gradient boundary, performed separate surveys to locate the boundaries of the stretch of the river adjoining the surveys involved in the boundary dispute. In making his survey, Shine found a braided river with an average width between its banks of about 3400 feet, and with the narrowest point, as he recalled, of 1608 feet, although there could be narrower points. In making his survey, Wilson found a single channel river, not a braided one, which averaged between 30 to 50 feet in width, with it being 17 to 20 feet wide in some places.

■ Moving for partial summary judgment, Brainard secured the trial court's ruling that "the riparian owners are entitled to have their land abut and be washed by the present flow of water, as established by . . . a gradient boundary survey done under present conditions on the Canadian River, and not as of a date before Sanford Dam was closed." Then, given the ruling and the Wilson and Shine surveys filed of record, Brainard moved the court to declare the testimony of Shine (and resultantly his survey), as well as the supporting testimony of James Estes, Ph.D., a botanist, and Stanley A. Schumm, Ph.D., a geomorphologist, irrelevant and inadmissible. *See* Tex.R. Civ. P. 166; Tex.R. Civ. Evid. 104(a). The theory of irrelevancy was that the testimony of the witnesses would attempt to establish, contrary to the court's ruling for a survey under present conditions of the river, the present gradient boundary of the riverbed as the historical banks of the river before the Sanford Dam was closed in 1965. In support of the theory, Brainard pointed out to the court that presently the normal, constant flow of water in the Canadian River is a stream about 30 feet wide and four feet deep; yet, although there never was a survey of the river adjacent to the lands involved in the litigation, the State contends for the last natural bed of the river before the construction of the Sanford Dam.

At a hearing on the motion to exclude the evidence and on Brainard's third motion for partial summary judgment, the court, considering the entire file, concluded and ordered that the survey performed by Shine, his opinions as to the methodology and location of the gradient boundary, and the testimony of Schumm and Estes, were not admissible as evidence in the cause. The court further concluded that there were no genuine issues of material fact, and ordered that under its legal rulings previously made, Brainard's third motion for partial summary judgment was granted, and that the gradient boundary

5. In *Johnson v. Phillips Petroleum Co.*, 257 S.W.2d 813 (Tex.Civ.App.—Amarillo 1953, no writ), the correct location of the south bank of the Canadian River at a point west of the properties in this cause was at issue, and the court, finding that the Canadian River basin was practically an exact duplicate of the Red River basin described in *Oklahoma v. Texas*, 260 U.S. at 634, 43 S.Ct. at 225–26, held that the rules for establishing the gradient boundary on an accretion bank, not a cut bank, define the correct method of ascertaining the south bank of the river. *Id.* at 814–15.

of the riverbed is marked by the survey performed by Wilson.

Relative to the court's exclusion of Shine's opinions and his survey, the record reveals that his survey of the river area in dispute was the product of his employment as a consultant to the General Land Office. The employment resulted from a notice that the land office was appropriated funds in 1985 by the 69th Legislature "for the purpose of conducting a gradient boundary line survey of the [Canadian] river," and that "[t]he land office is to determine the historical gradient line prior to any changes in the river caused by dams or other man-made alterations." Gen. Land Ofc. Consultant Proposal Requests, 10 Tex. Reg. 4244 (1985). Shine denied being told the survey to be done would be the boundaries of the river as they existed just prior to the closing of Sanford Dam; rather, he was told to run a gradient boundary survey. He began his survey in 1986 and completed it in 1989 or 1990.

Affirming the method he used was consistent with the Stiles theory, he readily conceded that he used historical data to aid him in his survey of the river, but said he used it in conjunction with present data. He found data from a 1960 survey was reliable evidence of the flowing water and it paralleled the present flowing predominant channel of the water in the river, but he denied that the gradient boundary contained in his survey was the same as it would have been in 1960 and 1965. Theoretically, he said, the gradient boundary is good only for the moment, but practically it may be good for some period of time. A river, he added, "moves" according to the various and different floods that come, and he personally knew of areas of the river that had changed since his survey.

A gradient boundary, Shine explained, is made up of two elements—a qualified bank, i.e., the first bank that contains the river, and the gradient of the flowing water in the stream. In making his survey, Shine found 14 qualified banks, all of which were alluvial banks of the same relative height, and used the three lowest banks in the beginning, the middle, and the end of his survey. Within the riverbed, the area between the qualified banks, there are numerous channels of water and one predominant channel, albeit some areas were dry. Prior to construction of Sanford Dam, floods kept the riverbed swept clean, but with the restriction of the water flow, there are braided channels of water and vegetation has grown in the riverbed.

The gradient, according to Shine with reference to the Stiles method, must be determined from the surface of the flowing stream, or from some evidence of the water surface and the flowing stream. He "tied in" the flowing water surface in a number of places up and down the river, and then compared it to the gradient that was determined from the 1960 survey, which he considered to be indisputable evidence of the water surface. By the comparison, he found that for all practical purposes, they were parallel although the surface of the existing stream is lower. He used gauges to determine any fluctuations in the water surface as datum for locating the gradient boundary, which is controlled by the elevation of the water at each point on the gradient boundary. And he professed to have seen water flowing against the banks he located, although it is not clear from the record when the event was witnessed.

Shine's explanation of his survey marking the present gradient boundary of the river served to defuse Brainard's theory of the survey's irrelevancy and inadmissibility because it attempted to establish the gradient boundary before the Sanford Dam was closed in 1965. Thus, the survey falls within the court's ruling for "a gradient boundary survey done under present conditions on the Canadian River, and not as of a date before Sanford Dam was closed"; but, admittedly, the survey does not show compliance with the other part of the court's ruling that "the riparian owners are entitled to have their land abut and be washed by the present flow of water." However, that entitlement is not warranted under the requirement that the "gradient boundary is determined by the bank of the river, not by the water in the river." 30 Tex. L.Rev. at 310.

We conclude, therefore, that Brainard's objection to Shine's survey was more properly directed to its weight rather than its admissi-

bility, and that the trial court erred in finding as a matter of law that the survey and harmonious testimony was inadmissible. The State's third-point contention of error in this regard is sustained.

■ The restoration of the Shine survey and related testimony before the trial court, which had accepted Wilson's survey, presented the court with two dissimilar surveys, prepared by licensed, professional land surveyors who represented the application of the same methodology to arrive at disparate results. Each surveyor disputed the correctness of the other's survey for various reasons, but particularly with respect to the boundary lines of the river each established. This state of the record only offers a genuine issue of material fact as to whether either survey, or neither of them, is correct, which is to be determined by a trier of fact, not by summary judgment serving to deny the litigants a full hearing on the merits of any real issue of fact. *Gulbenkian v. Penn*, 151 Tex. 412, 252 S.W.2d 929, 931 (1952). Consequently, the summary judgment portion of the judgment must be reversed and the cause remanded for a factual determination of the correct gradient boundary.

Conformably, we overrule the State's second-point contention that the trial court erred in denying its motion for summary judgment, and sustain the State's first- and fifth-point contentions that the court erred in granting summary judgment for Brainard because fact issues exist as to the correctness of his survey. These rulings pretermit a determination of the State's fourth-point contention that the location of the boundary by Wilson is premised on incorrect legal principles.

As previously mentioned, Brainard moved the court for, and secured, an award of attorney's fees and surveyor's fees. His motion was founded on two grounds. First, he submitted that he was entitled by statute to recover them if the court finds the State's action was frivolous, unreasonable, or without foundation, and he was awarded a judgment. Tex. Civ. Prac. & Rem.Code Ann. § 105.002 (Vernon 1997). Second, Brainard proposed that since he pleaded for a declaratory judgment settling the river boundary and declaring that Shine's survey does not state the lawful boundary, he was entitled to attorney's fees and costs under the Declaratory Judgments Act. Tex. Civ. Prac. & Rem.Code Ann. § 37.009 (Vernon 1997). The State responded that Brainard was not entitled to the awards sought by the prohibition in Senate Concurrent Resolution No. 165; or under section 105.002, *supra*, because the State's action has a reasonable legal foundation; or pleaded under section 37.009, *supra*, because the subject matter of the litigation does not fall within the limited waiver of sovereign immunity found by implication in the Declaratory Judgments Act.

The court granted Brainard's motion and, having submitted the amounts of attorney's and surveyor's fees to a jury, rendered judgment against the General Land Office for the amounts found by the jury with prejudgment interest thereon. With the use of its sixth and seventh points of error, the State has respectively challenged the award of the fees and prejudgment interest.

■ It does not profit to further address the contradictory positions of the parties, for we discern that as a matter of law an award of attorney's fees or surveyor's fees is not authorized. It was early decreed "that no state can be sued in her own courts without her consent, and then only in the manner indicated by that consent." *Hosner v. DeYoung*, 1 Tex. 764, 769 (1847). A waiver of sovereign immunity is a matter addressed to the Legislature, *Lowe v. Texas Tech University*, 540 S.W.2d 297, 298 (Tex.1976), and in waiving immunity, the Legislature is free to limit the terms of its consent for the State to be used in a manner it deems appropriate. *Trinity River Authority v. Williams*, 689 S.W.2d 883, 886 (Tex.1985).

■ Brainard's cause of action arose when the Legislature gave its consent for him to sue the State. *Mount Pleasant Ind. Sch. D. v. Lindburg*, 766 S.W.2d 208, 211 (Tex.1989). Once he brought his action, he became bound by the remedy and limitations contained in the Legislature's resolution. *State Dept. of Highways v. Dopyera*, 834 S.W.2d 50, 54 (Tex.1992). The remedy provided was a judicial determination of the boundary lines

between Brainard's surveys and the Canadian River, and the limitations were that no damages or attorney's fees were to be awarded, limitations the Legislature was free to impose. *Id.*

■ It follows that Brainard, being bound by the express terms of the sovereign's limited consent to be sued, cannot recover damages and attorney's fees. The State's sixth and seventh points of error are sustained.

Because of our partial remand, we reach Brainard's three conditionally submitted cross-points challenging the court's change of venue from Roberts County to Hutchinson County. After the cause had been pending in Roberts County for five years, the State applied to the court for a change of venue on the theory that it could not receive a fair and impartial trial in that county. Tex.R. Civ. P. 257(c). Brainard controverted the application, thereby joining the issue for trial by the court, with the burden upon the State to prove the facts upon which the change of venue motion was based. *Robertson v. Robertson*, 382 S.W.2d 945, 946 (Tex.Civ.App.—Amarillo 1964, writ ref'd n.r.e.).

■ In a change of venue hearing, the trial judge becomes vested with broad discretion to determine whether the application should be granted or denied. Unless an abuse of discretion is shown, the decision on venue should not be disturbed on appeal. *Id.*

The State presented two witnesses, Leah Tunnell and Wilford Jackson, to support its application. Tunnell, a resident of Austin, was an investigator for, and experienced in investigating matters at the request of, the General Land Office's general counsel. Tunnell traveled to Miami, the county seat of Roberts County, in an effort to determine if opinions about the litigation had been formed by residents of the county. She visited for approximately two hours and spoke to sixteen county residents, fourteen of whom were aware of the lawsuit, and three of whom signed affidavits. Based upon what the residents "said, their body language, ... their attitude toward [her], [and] the look on their faces," Tunnell said she had formed an opinion on the issue whether the State could obtain a fair trial in Roberts County. Over

Brainard's objection that lay opinion testimony cannot be based purely on hearsay, Tunnell was permitted to express the opinion that the State could not get a fair trial in Roberts County, explaining that her opinion was gathered from what she saw, including looking at the businesses in Miami, heard and felt from the people, and because of the small population which makes for a small jury pool.

Jackson, a resident of Miami for more than 45 years, and the owner of a business since 1960, stated he became aware of the lawsuit when he heard it discussed quite often at the coffee shop. The discussions, usually occurring three or four times a week, were between farmers, ranchers, land owners, and local business people. He said the primary economy of the county was mostly generated by farming and ranching, with some oil and gas operations. Most of the businesses, including his own, he added, are economically dependent upon the farming and ranching industry, the substantial ranchers exert considerable influence on the thinking and posture of the people in the county, and sentiment leaned toward the land owner. He thought everyone had an opinion, and his opinion was that he did not think the State could get a fair trial in Roberts County.

Over the objection of the State that the witnesses to be offered by Brainard had not been identified within thirty days of the hearing as persons with knowledge of relevant facts in response to interrogatories, Brainard was permitted to present the live testimony of one witness and excerpts from the deposition testimony, taken by the State, of three witnesses. The live testimony was adduced from Alan Lewis Dinsmore, superintendent of the Miami Independent School District. The excerpts were from deposition testimony given by Joann Morgenstern, the district and county deputy clerk, Jackie M. Jackson, the wife of Wilford Jackson and the retired district and county clerk, and Tom Stribling, the owner-operator of an elevator and feed mill operation in Miami.

Dinsmore had been the resident school superintendent for ten years. He learned about the lawsuit through media coverage, but he had not spoken to anyone about it

until he was called to make an affidavit, and he was not familiar with the prevailing attitudes in the county about the lawsuit or its issues. To his knowledge, none of the plaintiffs, only some of whom he knew, have unusual influence on public opinion in this case, and in his opinion, an impartial jury could be impaneled.

Morgenstern had lived in Miami since 1973 and had been employed as district and county deputy clerk for more than 17 years. She talked only with the clerk about the lawsuit and those discussions were brief. She reported the population of the county was over 1,000 and she thought there may be in excess of 700 potential jurors, but she did not know how many of them had an opinion about the outcome of the lawsuit. She opined that a fair trial could be had in the county.

Jackie Jackson had lived in Miami since 1960 and was the district and county clerk from early 1963 until the end of 1995. She became aware of the lawsuit when it was filed, and she would like to see it tried in Miami because the residents of the county are a fair and impartial bunch of people. When contacted by Tunnell, she refused "to say yea or nay" on the venue question; but, when the State filed its application for a change of venue, she, resenting the reference to her deputy being negatively impacted should the deputy sign an affidavit on behalf of the State's interest, called Brainard's attorneys and reported her resentment. At the request of the attorneys, she signed an affidavit prepared by them stating that in her opinion the State could receive a fair trial in Roberts County. She said that other than her deputy and the attorneys, she had not spoken with anyone concerning the lawsuit, and she could not say how the other people feel.

Tom Stribling, a resident of Roberts County since 1973 and a former mayor of Miami, said he probably heard about the lawsuit from his customers. He knew, and had furnished feed to, most of the Roberts County plaintiffs. His business depended upon the goodwill of the farmers and ranchers with whom he did business, but that was not a concern when he executed an affidavit stating that a fair trial could be received in Roberts County. He thought there were not very many people in the county who were not aware of some of the controversy leading to the lawsuit, but none of them had told him how the lawsuit "ought to come out."

Brainard's three cross-points are his contentions that the trial court erred in changing venue. In logical order, he contends that the court erred in admitting the testimony of Tunnell; there was no, or insufficient, evidence to support the court's finding that the State could not obtain a fair and impartial trial in Roberts County; and, therefore, the court abused its discretion in changing venue of the action out of Roberts County.

■ The objection to Tunnell's testimony was that what she heard from others was hearsay, and she had no personal knowledge of the facts about attitudes in Roberts County upon which she based her opinion. Personal knowledge of the matter is required before a witness may testify to a matter. Tex.R. Civ. Evid. 602. The necessary personal knowledge may be gained by perception of fact by the senses of the witness. *Strickland Transportation Co. v. Ingram,* 403 S.W.2d 192, 195 (Tex.Civ.App.—Texarkana 1966, writ dism'd). A lay witness may give testimony in the form of an opinion which is rationally based on the perception of the witness and helpful to a clear understanding of the testimony or the determination of a fact in issue. Tex.R. Civ. Evid. 701.

■ The perception underlying the lay witness's testimony may be what was seen, heard, smelled, tasted, touched or felt. Hulen D. Wendorf, et al., Texas Rules of Evidence Manuel VII–5 (3d ed.1991). Of course, what the witness heard may be, as Tunnell's testimony evinces, hearsay statements of which the witness has no personal knowledge; however, as her testimony also reveals, her opinion was based not only upon what she heard, but upon the perception she gained from the body language of the interviewees, their attitude toward her, the look upon their faces, and the small population of the county. Thus, Tunnell's opinion testimony was not wholly hearsay and inadmissible; instead, it was predicated upon both hearsay and personal knowledge and was admissible.

*Norris v. Lancaster*, 280 S.W. 574, 576 (Tex. Comm'n App.1926). The question then is not the admissibility of the testimony, but the weight to be given it.

Yet, before the sufficiency of the evidence is considered, notice must be taken of the State's objection to Brainard's venue evidence. The premise of the State's objection was that Brainard was obligated to, but did not, supplement his answers to pretrial interrogatories to identify each witness presented on the venue question. Tex.R. Civ. P. 166b.6. Since he did not do so, the State submits, he could not offer the testimony of the witnesses. Tex.R. Civ. P. 215.5.

The interrogatories to which the State refers were those it generated as a form of discovery in connection with the subject matter of the pending boundary litigation. Tex.R. Civ. P. 166b.1. They were a form of discovery designed to disclose facts bearing on the merits of the cause prior to trial. *See, e.g., State v. Lowry*, 802 S.W.2d 669, 671 (Tex.1991).

■■■ A venue controversy is a preliminary issue, unrelated to the merits of the cause. Procedure to seek a change of venue, which tests the availability of an impartial forum for the trial of the merits of a cause, is set forth in rules. Tex.R. Civ. P. 257–259. One of them, rule 258, permits reasonable discovery relative to the application to change venue, and it is through this avenue that persons having relevant knowledge of venue facts may be identified. *See Union Carbide Corp. v. Moye*, 798 S.W.2d 792, 792–93 (Tex.1990). In view of these provisions, we hold that it is unnecessary to supplement interrogatories concerning the merits of the cause in order for witnesses to testify at the venue hearing.

■■■ In considering the State's application for a change of venue, the court could, consistent with the testimony, judicially notice that the county had a census count of 1025 inhabitants. Two witnesses told the court they had heard inhabitants of the county discuss the litigation and, in light of those discussions, had formed the opinion that the State could not get a fair trial in the county. The court also heard the testimony of four witness, each of whom denied discussing the litigation with other inhabitants of the county, but who, nevertheless, felt the State could receive a fair trial in the county.

■■■ The testimony relative to venue was at least conflicting. An abuse of discretion does not exist when the court bases its decision on conflicting evidence. *Davis v. Huey*, 571 S.W.2d 859, 862 (Tex.1978). We, therefore, cannot say the court, by crediting the testimony of the witnesses who relied upon discussions had by county residents to form their expressed opinions, abused its discretion in changing venue. Brainard's three cross-points of error are overruled.

The summary judgment portion of the judgment decreeing that the riverbed of the Canadian River is marked by the survey performed by Wilson is reversed, and that cause is remanded to the trial court. The portion of the judgment decreeing Brainard's recovery of surveyor's and attorney's fees is reversed, and judgment is here rendered that Brainard take nothing by the action for those fees.

## ON MOTION FOR REHEARING

E.H. Brainard, II, and the other appellees (Brainard) have moved for an en banc consideration of their motion for rehearing, by which they vigorously contest our resolutions of the issues in this appeal. Remaining convinced that the issues were correctly resolved, the motion will be overruled with these additional comments regarding the issue of attorney's and surveyor's fees.

Without an in-depth address of the contradictory positions of the parties regarding the trial court's award of attorney's and surveyor's fees, we reversed that part of the judgment and rendered a take-nothing judgment on the theory that once Brainard brought the action authorized by the Legislature's resolution, he became bound by the limitation that the judgment "shall be limited to settling the title dispute and may not authorize an award of monetary damages or attorney's fees." *State Dept. of Highways v. Dopyera*, 834 S.W.2d 50, 54 (Tex.1992). Still, Brainard submits that we "failed to appreciate the difference between a legislative *resolution* waiving sovereign immunity for a suit against

the state, and a statute." Stating that a resolution has neither the dignity nor the effect of a statute, he cites "well-established law that the Legislate [sic] cannot override or suspend a statute by passing a resolution"—*e.g.*, "*Caples v. Cole*, 129 Tex. 370, 102 S.W.2d 173, 176–77 (Tex.1937) ('statutes cannot be amended by resolutions'); *State v. Allstate Ins. Co.*, 654 S.W.2d 45, 47 (Tex. App.—Austin 1983, writ ref'd n.r.e.) (in a resolution waiving sovereign immunity, Legislature may not suspend the state authorizing awards of prejudgment interest); *Buford v. State*, 322 S.W.2d 366, 370, 374–75 (Tex. Civ.App.—Austin, no writ), *cert. denied*, 361 U.S. 837, 80 S.Ct. 89, 4 L.Ed.2d 77 (1959) (legislative resolution waiving sovereign immunity cannot override statutes of limitations)"—to reurge the application of sections 37.009 and 105.002, Texas Civil Practice and Remedies Code Annotated (Vernon 1997), to expressly authorize the judgment for attorney's and surveyor's fees.

What we originally did, and still do, appreciate, however, is that Brainard's cited authority is inapposite to this cause. The Legislature, by the very wording of its resolution sanctioning a "final judgment adjudicating the title dispute in a suit brought concerning title to boundaries of the Canadian River under this resolution," authorized Brainard to bring a trespass to try title action, "the method of determining title to lands, tenements, or other real property." Tex. Prop. Code Ann. § 22.001(a) (Vernon 1984). Not only does the statute not make provision for attorney's fees or surveyor's fees, but the resolution itself strictly prohibits their recovery.

■ The fact that Brainard pleaded for a declaratory judgment settling the river boundary, by virtue of which he claims recovery of the fees under section 37.009, *supra*, is immaterial. His action was to determine title to the contested lands and, therefore, was not a declaratory judgment action, but was a trespass to try title action, for which attorney's fees are not authorized. *Barfield v. Holland*, 844 S.W.2d 759, 771 (Tex.App.— Tyler 1992, writ denied). *See also Ely v. Briley*, 959 S.W.2d 723, 727 (Tex.App.—Austin 1998, no writ) (holding that attorney's fees under the declaratory judgments act are not appropriate in a suit that is in the nature of a trespass to try title); *Griffin v. Collins*, 310 S.W.2d 137, 139 (Tex.Civ.App.1958, no writ) (holding that a suit for recovery of land based upon an equitable title, under the doctrine of equitable partition, is an action for trespass to try title and not for declaratory judgment).

■ By Brainard's suit, the State was called upon to defend its asserted title to the riverbed. Whether its defense or, as characterized by the trial court, its "actions ... have been unreasonable within the meaning of section 105.002(1)," *supra*, so as to merit an award of attorney's fees, as held by the trial court, was a question of law, which may be determined by the appellate court. *Black v. Dallas Cty. Child Welfare Unit*, 835 S.W.2d 626, 634 (Tex.1992) (Hecht, J., dissenting). We hold, as a matter of law, that the State's defense of its claimed ownership of the riverbed, even if ultimately found to not encompass the full area claimed to be owned, was not an unreasonable defense.

Brainard's motion for rehearing is overruled.